DeWine, J.
*364 {¶ 1} As they were responding to a radio call one night, two police officers heard the sound of nearby gunshots. They immediately drove a short distance to the area where the shots seemed to be coming from and, with guns drawn, detained the only person in the area. A pat-down of the man revealed a handgun. The question before us is whether this stop-a so-called Terry stop-violated the Fourth Amendment to the United States Constitution, see Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court of appeals held that it did and concluded that the trial court should have granted a defense motion to suppress the handgun and other evidence obtained during the stop. We disagree; we find no violation of the Fourth Amendment and reverse the judgment below.
I. Police respond to the sounds of gunshots, pat down the only person in the area, and recover a concealed firearm
{¶ 2} Columbus Police Officer Samuel Moore testified to the events that are at the center of this case during the trial court's hearing on the motion to suppress. As Officer Moore recounted the incident, at about 9:20 one evening in March 2015, he and his partner responded to a police dispatch about a domestic dispute. As they were getting out of their police cruiser, they heard the sound of four or five gunshots. The shots "weren't faint"; rather, "they appeared to be close." The officers immediately jumped back in their car and rushed to the area where the shots seemed *1135 to be coming from-outside a nearby elementary school.
{¶ 3} It took the officers about 30 to 60 seconds to get to an intersection just outside the school-a distance by car of about four-tenths of a mile. As they approached the intersection, they spotted an individual whom they later identified as Jaonte Hairston, walking away from the school into a crosswalk while talking on a cell phone. There was no one else around. The officers got out of the car and with weapons drawn ordered Hairston to stop. Officer Moore asked Hairston if he had heard the gunshots. Hairston replied that he had. Officer Moore then asked Hairston whether he was carrying any weapons. Hairston said he had a gun and nodded toward his jacket pocket. Officer Moore patted Hairston down and retrieved a handgun from his jacket. According to Officer Moore, at the time of the stop, Hairston talked to the officers calmly but "was somewhat nervous."
*365 {¶ 4} Following the arrest, Officer Moore wrote a police report stating that when the officers were exiting their cruiser, "they heard 4 to 5 gun shots west of their location" and that they "responded to the area where they heard the gun shots from." In explaining his actions, Officer Moore testified that he had patrolled the zone where he was working that night for his entire six-year police career. Drug activity-as well as assaults, robberies, and domestic violence-frequently occurred in the area around the school during the evening hours. He had previously made arrests there for those types of crimes, including gun-related arrests.
{¶ 5} Hairston was charged with carrying a concealed weapon in violation of R.C. 2923.12(A). He filed a motion to suppress the evidence obtained during the stop on the basis that the officers lacked reasonable suspicion to detain him.
{¶ 6} Following the hearing, at which Officer Moore was the only witness to testify, the trial court denied the motion to suppress. Applying the United States Supreme Court's decision in Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the court concluded that the officers had reasonable suspicion to perform an investigative stop.
{¶ 7} The Tenth District Court of Appeals saw it differently. The court reasoned that the sound of gunfire only implied that "someone, somewhere, had shot a gun." 2017-Ohio-7612, 97 N.E.3d 784, ¶ 13. It determined that there was no particularized connection between the gunshots and Hairston: "Hairston was simply the first person the officers saw after driving nearly one-half mile from where they stood when they heard the gunshots." Id. Nor did Hairston's actions before the stop and the surrounding contextual factors-Hairston's presence in an area with a high crime rate, his nervousness, or the time of night-amount to reasonable suspicion. Id. at ¶ 14-15. The appellate court reversed the trial court's judgment and remanded the case for further proceedings.
{¶ 8} We accepted the state's discretionary appeal. 152 Ohio St.3d 1420, 2018-Ohio-923, 93 N.E.3d 1002.
II. The officers had reasonable suspicion to stop Hairston
{¶ 9} The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Accord Ohio Constitution, Article I, Section 14.[1] Its protections extend to brief investigative *1136 stops that fall short of traditional arrests. United States v. Arvizu , 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). An officer may perform such a stop when the officer has a reasonable *366 suspicion based on specific and articulable facts that criminal behavior has occurred or is imminent. Terry , 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d 889. And when the officer is "justified in believing" that an individual may be "armed and presently dangerous," the officer may conduct a limited protective search of the individual for concealed weapons. Id. at 24, 88 S.Ct. 1868 ; Adams v. Williams , 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
{¶ 10} The reasonable-suspicion standard is less demanding than the probable-cause standard used when analyzing an arrest. United States v. Sokolow , 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The determination whether an officer had reasonable suspicion to conduct a Terry stop must be based on the totality of circumstances "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." State v. Andrews , 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). An assessment of the totality of the circumstances "does not deal with hard certainties, but with probabilities." United States v. Cortez , 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). We consider the cumulative facts "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Id.
{¶ 11} Here, the cumulative facts support the conclusion that the officers had a reasonable suspicion to stop Hairston. First, Officer Moore personally heard the sound of gunshots-the gunshots were not faint and sounded close-by. This is not a case in which the officers relied on a radio dispatch or other secondhand information about shots being fired, e.g. , In re D.W. , 184 Ohio App.3d 627, 2009-Ohio-5406, 921 N.E.2d 1114, ¶ 32 (2d Dist.), but one in which they heard and immediately reacted to the sound of nearby gunfire.
{¶ 12} Second, Officer Moore knew from personal experience that crime often occurred at night in the area where the stop took place. Officer Moore had worked the same beat for six years. He was familiar with drug and other criminal activity near the school, and he had made arrests for illegal weapons and other crimes there in the past. An officer's experience with criminal activity in an area and an area's reputation for criminal activity are factors we have found relevant to the reasonable-suspicion analysis. Andrews at 88, 565 N.E.2d 1271 ; State v. Bobo , 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988). Further, the stop occurred after dark-another circumstance we have found to be of some significance in the reasonable-suspicion analysis. Bobo at 179, 524 N.E.2d 489.
{¶ 13} But the most important considerations here are that the stop occurred very close in time to the gunshots and Hairston was the only person in the area from which the shots emanated. Officer Moore testified that upon hearing the shots, the officers immediately jumped in the cruiser and that it took them only *367 30 to 60 seconds to get to the intersection outside the school. When they arrived, Hairston-and no one else-was there.
{¶ 14} We conclude that these facts, taken together and viewed in relation to each other, rise to the level of reasonable suspicion. In holding otherwise, the court of appeals went through these factors individually and discounted the significance of each one. It determined that the facts that *1137 the officers heard the gunshots and stopped the only person in the area were of little moment because there was no "particularized connection" between the gunshots and Hairston. 2017-Ohio-7612, 97 N.E.3d 784, at ¶ 13. It further reasoned that the contextual factors asserted by the state-that the stop occurred at night and in an area known to the officers for criminal activity-provided "no additional support" to the state's claim of reasonable suspicion. Id. at ¶ 15. It also placed weight on the fact that Hairston did not flee when the officers told him to stop. Id. at ¶ 14.
{¶ 15} The court of appeals went astray by focusing on individual factors in isolation rather than on the totality of the circumstances. Arvizu , 534 U.S. at 274, 122 S.Ct. 744, 151 L.Ed.2d 740. The reasonable-suspicion determination must be "based on the collection of factors, not on the individual factors themselves." (Emphasis sic.) State v. Batchili , 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 19 ; accord Arvizu at 274, 122 S.Ct. 744. The court also erred in refusing to give any weight to the contextual factors asserted by the state. The "officers [were] not required to ignore the relevant characteristics of [the] location in determining whether the circumstances [were] sufficiently suspicious to warrant further investigation." Illinois v. Wardlow , 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Further, the court placed undue reliance on the fact that the suspect did not flee. See State v. Williams , 51 Ohio St.3d 58, 59, 63, 554 N.E.2d 108 (1990) (officer had reasonable suspicion despite defendant's lack of flight).
{¶ 16} While the court of appeals may have been correct in concluding that none of the individual factors that the state relied on was sufficient in itself to create a reasonable suspicion, we conclude that taken together-considering the totality of the circumstances through the eyes of a reasonable police officer-the cumulative facts did rise to the level of reasonable suspicion.
{¶ 17} The chief justice's dissenting opinion claims that Officer Moore "did not have a specific idea of where the shots came from, and he merely stopped the first person he encountered while driving." Dissenting opinion, O'Connor, C.J., at ¶ 41. But this assertion is contrary to Officer Moore's testimony that "[t]he shots sounded as though they were coming from the west near the elementary [school]." The suggestion that the officers simply stopped the first person they saw ignores Officer Moore's testimony that they had traveled to and arrived at the location they believed the shots had emanated from-the elementary school.
*368 {¶ 18} Part of police work is investigating criminal activity that officers detect while out on patrol. Here, the officers did exactly what one would expect reasonable and prudent police officers to do in their situation. Upon hearing gunshots, they proceeded immediately to the location they believed the shots to be coming from to investigate. Finding only Hairston in the area and knowing that criminal activity frequently occurred there, the officers were not required to ignore Hairston's presence, nor was it necessary for them to attempt to speak to him without taking precautions for their own safety. To the contrary, it was reasonable and prudent for the officers to stop Hairston to see if he was the source of or had information about the gunshots. And because the gunshots gave the officers reason to suspect that Hairston was armed, they were justified in patting him down for their safety. Terry , 392 U.S. at 30-31, 88 S.Ct. 1868, 20 L.Ed.2d 889 ; Andrews , 57 Ohio St.3d at 89, 565 N.E.2d 1271.
*1138 {¶ 19} Thus, we conclude that the trial court's denial of the motion to suppress was supported by competent, credible evidence. See State v. Burnside , 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.
III. The stop was not converted into an arrest
{¶ 20} Hairston also attempts to defend the judgment below on a ground different from the one that the court of appeals relied on: he argues that by approaching him with their guns drawn, the officers placed him under arrest and that they lacked probable cause for the arrest. We disagree. The officers' suspicions and the surrounding circumstances warranted approaching Hairston with weapons ready. And because the officers were justified in having their weapons drawn, the showing of firearms did not convert the stop into an arrest.
{¶ 21} Police officers may take steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a] stop." United States v. Hensley , 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). The "mere use or display of force in making a stop will not necessarily convert a stop into an arrest." United States v. Hardnett , 804 F.2d 353, 357 (6th Cir.1986). Whether an investigative stop is converted into an arrest depends on, first, whether the officers had reasonable suspicion to make the stop, and second, whether the degree of intrusion into the suspect's personal security was reasonably related to the officers' suspicions and the surrounding circumstances. Id. at 356, citing Terry , 392 U.S. at 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889.
{¶ 22} Investigating gunshots and suspects who are potentially armed presents a dangerous situation for the responding officers. Here, the officers were in an area known for criminal activity and they had just heard someone fire a gun. Their suspicions that it was Hairston who had fired the shots and that he was still armed justified the precautions they took in approaching him with their weapons drawn. Because the officers had legitimate safety concerns, the fact that they had *369 their guns drawn when they approached Hairston did not convert the investigative stop into an arrest. Hardnett at 357.
IV. Conclusion
{¶ 23} Based on the totality of the circumstances, the police officers had reasonable suspicion to stop Hairston. Furthermore, they did not convert the stop into an arrest by approaching Hairston with their weapons drawn. We reverse the judgment of the court of appeals.
Judgment reversed.
Kennedy, French, and Fischer, JJ., concur.
Donnelly, J., concurs in judgment only, with an opinion.
O'Connor, C.J., dissents, with an opinion.
Stewart, J., dissents, with an opinion joined by O'Connor, C.J.
Donnelly, J., concurring in judgment only.
{¶ 24} I concur in judgment only. Our sole task in this appeal is to decide whether Officer Samuel Moore reasonably suspected that appellee, Jaonte Hairston, was the person who fired the gunshots that police had heard nearby in a residential neighborhood. This task is resolved by reviewing the totality of the circumstances, as a court does in any run-of-the-mill suppression *1139 case in which the state asserts the probable-cause exception established in Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because there is no new standard of law to be determined here, the most appropriate action would be to dismiss this appeal as having been improvidently accepted. But if we are going to address the merits, our analysis needs to fit the facts of this case.
{¶ 25} The majority is correct that the time of night and high-crime reputation of an area can be relevant in determining whether criminal activity might be afoot. Majority opinion at ¶ 10, citing State v. Andrews , 57 Ohio St.3d 86, 88, 565 N.E.2d 1271 (1991) (police officer reasonably suspected that a crime might be occurring due to the suspect's flight and other furtive movements while in the dark of night in a high-crime neighborhood); State v. Bobo , 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988) (police officer reasonably suspected that a drug crime might be occurring due to the suspect's furtive movements in a vehicle while parked at night in an area of very heavy drug activity). In Hairston's case, though, no one disputes that Officer Moore already knew that a crime involving the discharge of a firearm had occurred nearby and no one disputes that the shooter would almost certainly be armed 60 seconds after the fact. The only relevant un certainty was the identity of the person who had fired the shots. Andrews and Bobo are therefore inapposite.
*370 {¶ 26} The fact that a crime recently occurred does not give police officers carte blanche to stop any person they find in the area; instead, before stopping a person, the officers must have an objective basis for suspecting that that particular person was involved in the criminal activity. See United States v. Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ; Ybarra v. Illinois , 444 U.S. 85, 94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("The 'narrow scope' of the Terry exception [to the probable-cause requirement] does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked * * *"). Nothing about the time of night or high-crime reputation of the neighborhood gave Officer Moore any insight into the identity of the shooter. Contrary to the majority's position, the Tenth District Court of Appeals was correct that the contextual factors of a nighttime stop and a high-crime area were legally irrelevant in Hairston's case.
{¶ 27} Instead, the salient facts here are that Officer Moore personally heard the sound of the shots being fired, immediately went to the location where the sound had originated, and encountered Hairston in the street in that area. Given how close Hairston was to the crime, in both time and place, I would hold that the trial court's determination of reasonable suspicion was legally justified. See United States v. Goodrich , 450 F.3d 552, 562 (3d Cir.2006) (holding that a suspect's "geographical and temporal proximity" to the scene of a crime is an "important factor militating strongly in favor of the validity of the stop"); United States v. Fisher , 597 F.3d 1156, 1159 (10th Cir.2010) (holding that the police were justified in stopping the only vehicle present at the scene three minutes after a report of shots fired).
{¶ 28} The trial judge himself noted that Hairston's case was "a close call." I agree. I think a perfectly reasonable finder of fact could have come to a different conclusion about the reliability and accuracy of Officer Moore's testimony and could have granted Hairston's motion to suppress. The Tenth District seems to have arrived at that reasonable finding of fact. The problem, though, is that an appellate court cannot usurp the fact-finding role of the trial court.
*1140 {¶ 29} It is well established that "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence," given that the trial court is "in the best position to resolve factual questions and evaluate the credibility of witnesses." State v. Burnside , 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Only after accepting the trial court's factual findings as true should the appellate court proceed to determine whether those facts satisfy the applicable legal standard in a motion to suppress. Id.
{¶ 30} The Tenth District based its legal analysis on its own conclusion that Officer Moore had no objective knowledge about the circumstances of the crime immediately preceding the Terry stop beyond the fact that "someone, somewhere"
*371 had fired a gun. 2017-Ohio-7612, 97 N.E.3d 784, ¶ 13. The sole, unremarkable error before us in this appeal is that the Tenth District inappropriately disregarded the trial court's factual finding that the police knew when and where the shots had been fired.
{¶ 31} Because the trial court appropriately weighed the totality of the circumstances pursuant to Terry in reaching its decision and because the appellate court failed to defer to the trial court's factual findings regarding those circumstances as required by Burnside , the Tenth District's judgment should be reversed. Again, given that the standards articulated in Terry and Burnside are well established, a reversal by this court is quintessential error correction. But if the court remains committed to error correction in this case, I join the reversal by concurring in judgment only.
O'Connor, C.J., dissenting.
{¶ 32} I dissent. I would conclude that the stop and search of appellee, Jaonte Hairston, violated the Fourth Amendment to the United States Constitution. The facts known to the officers at the time did not support a reasonable suspicion that Hairston was engaged in criminal activity, the standard that the United States Supreme Court established in Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that this court has applied many times. See, e.g. , State v. Andrews , 57 Ohio St.3d 86, 565 N.E.2d 1271 (1991) ; State v. Bobo , 37 Ohio St.3d 177, 524 N.E.2d 489 (1988). The majority opinion erodes the constitutional standard established in Terry and creates the unwise precedent that a police officer may conduct an investigative stop of any person present in a so-called "high crime" area as long as the officer has recently heard gunshots, without any specific and articulable facts pointing more directly to that particular person's being engaged in criminal activity. Because I cannot support this material erosion of the Fourth Amendment, I dissent.
Relevant Background
{¶ 33} The majority presents one version of the facts based on the testimony of the only witness at the suppression hearing, Columbus Police Officer Samuel Moore. But Officer Moore reported slightly different facts on the department's arrest-information form,[2] and those differences underscore why the stop violated the Terry standard. Although the majority implies that Officer Moore believed that the gunshots came from outside a nearby elementary school, the arrest form more generally describes the gunshots as coming from "west of [the] location" of Officer Moore and his partner, Officer Frederick Kaufman. The officers' location when they heard the gunshots was several streets *1141 away at a residence from *372 which a domestic dispute had been called in. At the suppression hearing, the state introduced an aerial photo that shows the location of the domestic-dispute call, the school, and the intersection where the officers stopped Hairston. The photo, which was admitted into evidence, demonstrates that Independence High School was directly west of the officers' location when they heard the gunshots. The elementary school and the intersection where the stop took place were southwest of the officers' location.
{¶ 34} Indeed, "west" is as close as Officer Moore was able to pinpoint the location of the gunshots. At one point, Officer Moore's testimony substantiates his belief that the gunshots emanated from closer to the high school. At the suppression hearing, the prosecution asked Officer Moore to describe the layout and exterior of Independence High School. Following this line of questioning, Officer Moore stated that the gunshots "appeared to be close. They weren't faint. From my guesstimate, it was about the school." At another point, Officer Moore testified that the shots emanated "from the west near the elementary." The two schools are located on one large campus.
{¶ 35} While Officers Moore and Kaufman were on their way toward the high school, they saw Hairston walking into the crosswalk near the elementary school. The officers exited their cruiser with their service weapons drawn and instructed Hairston to show them his hands. Following that instruction, according to the arrest form, "Officer Kaufman kept his service weapon drawn to cover Officer Moore as he patted down Mr. Hairston for weapons." Then "Officer Moore asked Mr. Hairston if he heard the gunshots to which Mr. Hairston said he did. Officer Moore instructed Mr. Hairston to place his hands behind his back so he could pat him down."
{¶ 36} At the suppression hearing, Officer Moore affirmed the accuracy of the information he had reported on the arrest form and testified that it was not until after Hairston's hands were behind his back in preparation for the pat-down that Moore asked Hairston whether he had any weapons on him. The majority notes that Officer Moore's questioning of Hairston-during which he asked whether Hairston was carrying any weapons and Hairston said he had a gun and nodded toward his jacket pocket-occurred prior to the physical pat-down, implying that the officers' search could still have been consensual at that point. But, as a reasonable police officer would know, a pat-down is lawful only when the officer is entitled to make a forcible stop. Adams v. Williams , 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Therefore, there is no question that at the time the pat-down process commenced, when Officer Moore instructed Hairston to place his hands behind his back, a forcible stop had occurred.
{¶ 37} We must determine whether there was reasonable suspicion to stop Hairston before that point.
*373 Analysis
{¶ 38} The United States Supreme Court described the reasonable-suspicion standard in Terry , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and the standard has changed little since then, although courts have further defined it. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21, 88 S.Ct. 1868. Terry requires the court to "evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." Id. The reasonableness of the suspicion must be judged against an objective standard: "[W]ould the facts available *1142 to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Id. at 21-22, 88 S.Ct. 1868, quoting Carroll v. United States , 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). "The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances," State v. Freeman , 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus, " 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training,' " id. at 295, 414 N.E.2d 1044, quoting United States v. Hall , 525 F.2d 857, 859 (D.C.Cir.1976). But the search cannot be "based on nothing more substantial than inarticulate hunches * * *. And simple 'good faith on the part of the arresting officer is not enough.' " Terry at 22, 88 S.Ct. 1868, quoting Beck v. Ohio , 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).
{¶ 39} Taken together, and when viewed through the careful eyes of a reasonably prudent law-enforcement officer, the specific and articulable facts in this case, in my view, did not give rise at the time the officers stopped Hairston to reasonable suspicion that he was engaged in criminal activity. Although the majority recites a number of cases that contain some similar facts that led to a finding of reasonable suspicion, the totality of the circumstances here requires a different conclusion.
{¶ 40} The majority seems to recognize that the sound of gunshots in a "high crime" area is not enough to establish reasonable suspicion for a stop in the absence of other factors,[3] and it therefore notes other "important considerations"
*374 that it believes help satisfy the standard for reasonable suspicion in this case. Majority opinion at ¶ 13. To bolster its conclusion that the officers had reasonable suspicion to stop Hairston, the majority identifies what it believes to be the two "most important considerations here"-that "the stop occurred very close in time to the gunshots and Hairston was the only person in the area from which the gunshots emanated"-without citing any precedent for the relevance of these considerations. Id. While these may be legitimate factors to consider, I would conclude that in this case, the totality of the circumstances that existed at the time the officers conducted the stop did not support a reasonable suspicion by the officers that Hairston was engaged in criminal activity. The majority is lowering the Terry standard well below what the Constitution allows.
{¶ 41} For a stop based, in part, on recent gunshot sounds to be upheld, a court must find that the officer believed that the gunshots were fired in the immediate vicinity of the hearer such that the *1143 shooter would not have had time to flee prior to arrival of the officer. See State v. Tally-Clayborne , 378 Wis.2d 741, 2017 WI App 80, 905 N.W.2d 844, ¶ 10 (gunshots came from within one block of officer's location and officer saw suspect within 20 to 25 seconds of hearing gunshots); People v. Basiak , 50 Ill.App.3d 155, 156-157, 8 Ill.Dec. 332, 365 N.E.2d 570 (1977) ("shot appeared * * * to have originated from around the corner" and officers saw defendant immediately upon turning corner). But in this case, the fact that the stop occurred close in time to the gunshots is irrelevant because the shots were not particularly close in location, Officer Moore did not have a specific idea of where the shots came from, and he merely stopped the first person he encountered while driving in that direction.
{¶ 42} Unlike other cases in which courts have relied on the fact that the stop was made soon after gunshots had been heard to support a finding of reasonable suspicion, the officer here did not indicate that the gunshots had been fired particularly close-by. Officer Moore "guesstimate[d]" that the gunshots had been fired from the west. The majority places undue emphasis on one statement by Officer Moore that the gunshots came from "near the elementary" school, but ignores other testimony suggesting that the location was directly west and near the high school. These inconsistencies underscore Officer Moore's lack of confidence in the precise location of the gunshots.
{¶ 43} But, even if we accept that the shots came from somewhere on the campus of the two schools, Officer Moore was still between four-tenths and a half *375 mile away from the location of the gunshots. That distance is farther than the one or two blocks many courts have considered close for purposes of supporting reasonable suspicion when an officer immediately responded to gunshots and found only one person or group in the area. See Tally-Clayborne at ¶ 10 (one block); Commonwealth v. Griffen-Jacobs , Penn.Sup.Ct. No. 1891 EDA 2016, 2017 WL 4992754, *1 (Nov. 1, 2017) (approximately one block); Basiak at 156, 8 Ill.Dec. 332, 365 N.E.2d 570 (around the corner); State v. Brooks , 281 So.2d 55, 56 (Fla.App.1973) (around the block); People v. Lee , 48 Ill.2d 272, 274, 269 N.E.2d 488 (1971) (about two blocks).
{¶ 44} Even in cases in which the location of the gunshots was very close, however, courts have typically relied on additional evidence-that directly implicated the defendant-to support a finding of reasonable suspicion. In one case the state cited, police heard gunshots while patrolling an area after reports of gang violence. Lee at 277, 269 N.E.2d 488. The only people they found in the vicinity of the gunshots were wearing clothing associated with one of the local gangs, a key factor in the court's finding reasonable suspicion justifying the stop. Id. In another case, the only people found in the vicinity of the gunshots fled police, which supported a finding of reasonable suspicion. See Griffen-Jacobs at *1-3. And in some cases, the suspects' behavior supported a finding of reasonable suspicion. Tally-Clayborne , 378 Wis.2d 741, 2017 WI App 80, 905 N.W.2d 844, at ¶ 10 (prior to search, officers saw defendant reaching for his waistband when he started to walk away from them); Faulkner v. State , 727 S.W.2d 793, 796 (Tex.App.1987) (suspect's truck made a quick U-turn near location of gunshots); Brooks at 56 (gunshots occurred at 4:00 a.m., and defendants claimed not to have heard them despite being one block from officers' location when officers heard the gunshots). Here, the officer had no direct evidence suggesting Hairston was engaged in criminal activity-he was calmly walking in a crosswalk, speaking on a cell phone.
*1144 {¶ 45} In this case, the gunshots were not particularly close, the officer's only definite suggestion as to the location of the shots was "west," and there was no direct evidence implicating Hairston. These facts suggest that the officers heard the shots, traveled west, and stopped the first person they encountered. These facts do not support the reasonable and articulable suspicion required to justify a stop.
{¶ 46} Indeed, the other "important consideration" that the majority relies on-that Hairston "was the only person in the area from which the gunshots emanated"-is similarly flawed and not a legitimate factor supporting reasonable suspicion in this case. Leaving aside the fact that the state did not persuasively establish that Hairston had actually been in the vicinity of the gunshots, it is simply not true that Hairston was the only person in the area in which he was *376 stopped. Although he was the only person seen by the officers at the time, nothing he was doing distinguished him from the general population so as to give rise to reasonable suspicion.
{¶ 47} The officers stopped Hairston in a dense residential area. Officer Moore admitted that the area has "a lot of houses" and that "[t]here's a lot of people that live there in all those houses." The aerial photo of the area shows that the officers passed more than three dozen houses driving from the site of the domestic-dispute call to the intersection where they stopped Hairston. There are hundreds more houses in the surrounding area within a mile west of the site of the domestic-dispute call. These circumstances are not comparable with the cases the state cites in support of this purported factor. In fact, it would defy logic to compare this case to those the state cites. In those cases, in which courts heavily relied on the fact that the suspects were the only people found in the vicinity of the gunshots, the vicinity was a deserted commercial area. See State v. Brown , 232 Neb. 224, 226-228, 439 N.W.2d 792 (1989) (defendant and two companions were found in a deserted commercial area); Basiak , 50 Ill.App.3d at 157, 8 Ill.Dec. 332, 365 N.E.2d 570 (defendant and another man found in an area with a closed restaurant, its parking garage, and vacant lots).
{¶ 48} Hairston may have been the only person Officer Moore saw while driving to the high school, but there were certainly numerous people in the neighborhood and, importantly, a lot of places to hide. After firing the shots heard by the officers, the shooter could have simply walked inside a house or hidden behind a house or some other obstruction. Although the officers had no duty to search each house and yard, absent any additional specific and articulable facts to support the officers' belief that Hairston was engaged in criminal activity, the fact that Hairston was the only person walking down the street does not help meet the reasonable-suspicion standard.
{¶ 49} This case is also distinguishable from those in which the defendant was the only person found in the vicinity of gunshots in the middle of the night. See Griffen-Jacobs , 2017 WL 4992754, at *1 (shortly after midnight); Brown at 225, 439 N.W.2d 792 (approximately 2:00 a.m.); Faulkner , 727 S.W.2d at 796 (around 3:00 a.m.) ; Basiak at 156, 8 Ill.Dec. 332, 365 N.E.2d 570 (approximately 2:00 a.m.); Brooks , 281 So.2d at 56 (4:00 a.m.). Hairston was stopped on the street at around 9:20 p.m. Although 9:20 is relatively late in the evening, it is not a time that one would expect a residential street to be deserted, in contrast with the very late or early-morning hours when the stops in the cited cases occurred.
*1145 {¶ 50} In asserting my belief that the officers did not have reasonable suspicion to conduct a Terry stop of Hairston, I in no way demean the good work being done by law enforcement who investigate crimes and keep the public safe every day in this state. But I fear that the majority risks more harm to Ohioans by *377 lowering the bar well below the standard the Constitution requires. In this case, officers stopped and searched a person who appeared to be lawfully, casually walking in a crosswalk at 9:20 p.m. in a residential area crowded with homes. Even considering the officers' opinion that the area in which they found Hairston was known for its high crime rate and one officer's "guesstimate" that Hairston was in the vicinity of recent and close gunshots, I would conclude that the state did not prove a reasonable articulable suspicion sufficient to justify the stop of Hairston. Thus, I would conclude that the state violated Hairston's Fourth Amendment rights, affirm the Tenth District's judgment, and suppress the fruits of the search. Accordingly, I dissent.

Article I, Section 14 of the Ohio Constitution contains nearly identical wording to the Fourth Amendment. The parties have not presented any argument under the Ohio Constitution; thus, we do not consider whether different standards might apply under the two provisions.

Officer Moore corroborated the veracity of the arrest form during cross-examination.

It is true that this court has determined that a law-enforcement officer's knowledge at the time he is contemplating the stop that crime is prevalent in the area is a legitimate factor to consider in the reasonable-suspicion analysis. See Andrews , 57 Ohio St.3d at 88, 565 N.E.2d 1271 ; Bobo , 37 Ohio St.3d at 179, 524 N.E.2d 489. It is also true that it is a legitimate factor to consider that the sound of gunshots could imply that a crime may be happening contemporaneously at a nearby location. See, e.g. , State v. Tally-Clayborne , 378 Wis.2d 741, 2017 WI App 80, 905 N.W.2d 844, ¶ 10. But these two factors alone generally are not enough. For instance, in State v. Brooks , a Florida appellate court observed that moments after hearing gunshots nearby, officers "may not frisk simply because they saw two men sitting on the steps at 4:00 o'clock in the morning * * * in a 'high crime' area." 281 So.2d 55, 56 (Fla.App.1973). In that case, one of the men "replied that he had heard nothing like a shot although he and his friend said they had been there a while." Id. The suspect's denial was a central factor leading the court to find reasonable suspicion. Id.