[Cite as *State v. Stanton*, 2020-Ohio-4087.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28574 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-1092 |
| | : | |
| ROBERT LEQUAN STANTON | : | (Criminal Appeal from Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of August, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JOHN S. PINARD, Atty. Reg. No. 0085567, 120 West Second Street, Suite 603, Dayton, OH 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** After the trial court overruled his motion to suppress, Robert Lequan Stanton pled no contest to having weapons while under disability. The trial court found him guilty and sentenced him to up to five years of community control. Stanton appeals from his conviction, claiming that the trial court erred in denying his motion to suppress. For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

**{¶ 2}** The evidence at the suppression hearing revealed the following facts.

**{¶ 3}** Around 11:00 p.m. on March 25, 2019, a tan 2008 Buick Lucerne[1] (a four-door sedan) with a temporary license plate fled from Officer Andrew Lane and his partner, Officer Zachary Banks. Officer Lane testified that the color of the Buick was "kind of unique," and he believed it was not a "factory paint color." The officers had no information about the driver of the Buick. Officer Lane researched the license plate and learned that the vehicle was registered to a woman.

**{¶ 4}** A few days later on March 28 at 7:27 p.m, while on road patrol in a marked cruiser, Officers Lane and Banks noticed what they believed was the same Buick parked in the parking lot of an Auto Zone. The officers turned into the Auto Zone parking lot. At the same time, Stanton walked out of the store and proceeded along the sidewalk between the store and the parked vehicles, toward the Buick. Lane indicated that there were three or four other vehicles in the parking lot, and "they were all parked right along

---

[1] Officer Lane testified that he thought the broadcast was for a Buick LaCrosse, but indicated that the model was listed in the police report. The report identified the vehicle as a Buick Lucerne.

the front row of the building there."[2]  Stanton was looking down at his purchase as he walked.

{¶ 5} The officers pulled in front of the Buick, which had backed into the parking space.  Stanton then stepped off the curb along the driver's side of the Buick, took a couple steps toward the driver's door, and stopped.  Officer Lane acknowledged that he did not see Stanton reach for the door handle, but he testified that Stanton had gone over to the driver's door.  Based on Officer Lane's testimony, the trial court found that Stanton "walked up to the car."  (July 2, 2019 Hrg., p. 9.)

{¶ 6} Stanton looked up and saw the officers.  Stanton then "[did] a double take and turn[ed] around and start[ed] to walk away from the car back towards the back of the parking lot."  It is somewhat unclear which direction Stanton walked.  On cross-examination, Officer Lane stated that Stanton tried to walk past the cruiser and leave the parking lot.  (Supp. Tr. at 26.)  Officer Lane later stated that Stanton stepped back onto the sidewalk and started to head toward an area where no cars were parked.  (Supp.Tr. at 33.)

{¶ 7} Both officers stepped out of the cruiser.  Upon exiting their vehicle, the officers noticed that the Buick's engine was running, the car had dark tinted side windows, no one was inside it, and music was playing loudly.  (The officers had heard the music upon turning into the parking lot.)

---

[2] In its oral ruling on the motion to suppress, the trial court stated that it had "observed all the photographs on the disk [State's Ex. 1] as well as the ones that were admitted.  Those photographs surely were not taken the second that the officers saw the Defendant and so to suggest that because the photographs show vehicles around the vehicle in question is not a representation of what was occurring when they had first saw the Defendant approach the vehicle."  (July 2, 2019 Hrg., p. 8-9.)

{¶ 8} Officer Lane walked around the Buick to look at the back license plate; it matched the plate of the vehicle that had previously fled from them. At the same time, Officer Banks approached Stanton, identified himself, and asked Stanton to speak with them. Stanton responded that he was just leaving. Officer Banks asked Stanton if he was driving the Buick. Stanton pointed to another car in the parking lot (a Nissan to the left of the Buick) and said that was his car, but he then tried to continue walking out of the parking lot. After Officer Lane confirmed that the Buick was the vehicle that had fled, Officer Banks handcuffed Stanton and placed him in the cruiser.

{¶ 9} Officer Lane went into the store and asked an employee if she knew who owned the Nissan; the employee indicated that the Nissan was hers. The officers walked around the Buick. Officer Banks, standing along the passenger side, told Officer Lane that he (Banks) could see a handgun sticking out from under the driver's seat. Officer Lane looked down and saw the gun through the driver's side window. Lane testified that he could see it more easily through the windshield, which was not tinted. Officer Lane took photographs of the gun from the exterior of the vehicle prior to collecting it. At some point, Officer Banks tested the window tint of the Buick and confirmed that it was in violation of Ohio's window tint statute. Officer Lane testified that the loud music also constituted a code violation.

{¶ 10} Officer Banks spoke with Stanton and asked him for identifying information. Soon thereafter, the officers learned that Stanton was subject to an arrest warrant. Ultimately, they arrested him on that warrant as well as for having a weapon while under disability.

{¶ 11} Because the Buick was in a public parking lot and Stanton was not the

registered owner of the vehicle, the officers decided to tow the Buick pursuant to Dayton's tow policy. The officers collected the gun as part of the inventory of the Buick.

{¶ 12} Approximately 30 minutes after Stanton was placed in the cruiser, Officer Banks read Stanton his *Miranda* rights. Officer Lane testified that he did not observe any behavior by Stanton that would suggest that Stanton was intoxicated or otherwise could not understand his rights. Lane did not hear Officer Banks make any threats or otherwise suggest that Stanton had to make statements. Stanton subsequently admitted to driving the car, but denied owning the gun.

{¶ 13} Stanton was charged with having weapons while under disability, a felony of the third degree. He subsequently moved to suppress the evidence, claiming that he was not lawfully stopped and detained and that the statements he made were not voluntary and were made in violation of his *Miranda* rights.

{¶ 14} The trial court denied the motion to suppress. In its oral ruling, the court specifically found that Stanton had walked up to the Buick. The court found that Stanton "only turned away when he saw the officers as he was at the door." (July 2, 2019 Hrg., p. 9.) Based on the window tint and the loud music, the officers had a reasonable suspicion of criminal activity to detain Stanton, "even if they didn't know that the Defendant was associated with the fleeing from the traffic stop the day previously [sic]." (*Id.*) The court further found that statements Stanton made regarding the Nissan were spontaneous statements and that the gun in the Buick was in plain view from outside the vehicle. The court also concluded that the statements made by Stanton while in the cruiser were not subject to suppression. The court filed a written entry adopting its oral pronouncement.

{¶ 15} Stanton subsequently pled no contest to having weapons while under

disability. The court sentenced him to community control. Stanton raises one assignment of error on appeal.

## II. Validity of the Stop and Detention

{¶ 16} Stanton's sole assignment of error claims that the officers lacked a reasonable and articulable suspicion of criminal activity to justify stopping and detaining him and, therefore, the evidence they gathered as a result of the stop should have been subject to the exclusionary rule.

{¶ 17} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 18} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *Id.*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances,

considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold."   *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991); *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, ¶ 10.

{¶ 19} The Ohio Supreme Court recently emphasized that "[a]n assessment of the totality of the circumstances 'does not deal with hard certainties, but with probabilities.' We consider the cumulative facts 'not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " *Hairston* at ¶ 10, quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Moreover, the existence of reasonable suspicion is determined "based on the *collection* of factors, not on the individual factors themselves." (Emphasis sic.) *Id.* at ¶ 15, quoting *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 19.

{¶ 20} Nevertheless, the officer must have more than an inchoate and unparticularized hunch or suspicion to justify an investigatory stop. *State v. Belvin*, 2d Dist. Montgomery No. 25987, 2014-Ohio-3634, ¶ 8; *Terry* at 22.   "[T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

{¶ 21} Stanton argues that the totality of the circumstances consisted of only two facts: the officers believed the parked Buick may have fled from them two days prior, and Stanton was walking near the Buick in an area where other cars also were parked. Stanton believes these facts were insufficient to establish reasonable suspicion.   Stanton emphasizes that the officers had no information about the driver of the vehicle that had

fled, and Officer Lane had to look at the license plate of the parked Buick to confirm that it was the same vehicle. He further emphasizes that the officers did not see Stanton with keys in his hand or see him reach for the door handle. Stanton thus asserts that the officers did not have a reasonable basis to conclude that he was the driver of the parked Buick.

{¶ 22} Stanton also argues that the trial court made several errors in its ruling on the motion to suppress. Stanton argues that the court's factual finding that the vehicle was empty contradicted Officer Lane's testimony that the officers did not know if the vehicle was occupied when they approached Stanton. Stanton further asserts that the trial court's reliance on window tint and music violations was incorrectly premised on an assumption that the officers had a reasonable suspicion that Stanton was the driver of the parked Buick.

{¶ 23} As an initial matter, the trial court's finding that the vehicle was empty was supported by competent, credible evidence. During his direct examination, Officer Lane testified about what was "notable about the car at the time" that he saw it. (Supp. Tr. at 9.) Read in context, the prosecutor appeared to be asking what the officers noted when they stopped in front of the Buick and got out. Lane responded: "Well, the engine's running, there's no one inside at the time, it has dark tinted windows on the side and -- and that's about it at that time." (*Id.* at 9.) With further questioning, Lane testified that the officers could hear music playing from the car, and they began hearing it as soon as they turned into the parking lot. (*Id.*)

{¶ 24} After cross-examination, the court had a few follow-up questions:

THE COURT: I do have a question because I want to make sure I'm clear.

When you approached that vehicle, you are investigating the flight from you several days before.

THE WITNESS: Yes.

THE COURT: Okay. And when you or your partner approached the Defendant, did you have any intention of searching that vehicle at that time or were you, again –

THE WITNESS: In that moment, we didn't even know if anybody was actually in the car yet.

THE COURT: Okay.

THE WITNESS: So we were just kind of –

THE COURT: Trying to figure out what was going on?

THE WITNESS: Trying to figure out what was going on.

THE COURT: Okay.

THE WITNESS: Yes.

(*Id.* at p. 30-31.)

{¶ 25} On redirect, the prosecutor attempted to clarify the violations that Officer Lane had seen.

Q Judge had asked a couple questions. When you pull into the lot, you are investigating the failure to comply as you stated to the judge.

A Yes.

Q What were the other violations, though, that the vehicle had?

A Yeah. Once we approached we observed the window tint and we could hear the loud music playing. The car had been left unattended, unlocked,

running with the keys in it which we didn't know just yet but. Those were all the violations that [sic] just on initial contact.

(*Id.* at p. 31.)

{¶ 26} Based on Officer Lane's testimony, the trial court could have reasonably found that the officers could hear music when they entered the parking lot, but did not have additional information about the Buick, such as if it were occupied. The officers stopped the cruiser in front of the Buick, which was faced outward toward the parking lot; the front windshield, which faced the cruiser, was not tinted. The court could have reasonably found that when the officers exited their cruiser in front of the Buick, the officers could then see that the Buick was unoccupied, was running, had heavily tinted side windows, and had loud music emanating from it. Although Officer Lane's testimony was somewhat inconsistent, the trial court resolved the factual question and its finding was supported by competent, credible evidence.

{¶ 27} The evidence at the suppression hearing also supported a conclusion that the Buick was involved in criminal activity. Officer Lane testified that he and Officer Banks recognized the Buick as a vehicle that he had fled from them a few days earlier. Most notably, Officer Lane testified that the vehicle was an unusual color, and he believed it was not a factory paint color for that car. Upon pulling up to the Buick, the officers noted that the side windows were heavily tinted and the car was playing music loudly, both of which were code violations. As Officer Banks approached Stanton, Officer Lane looked at the Buick's license plate and confirmed that the Buick was the same vehicle that had fled. When Officer Banks subsequently handcuffed Stanton and placed him in the cruiser, the officers had a reasonable suspicion that the Buick previously had been

involved in a failure to comply offense and was currently in violation of noise and window tint statutes.

{¶ 28} Stanton's primary argument is that the officers lacked a reasonable suspicion that he was the driver of the Buick. He thus claims that, even if the officers may have reasonably suspected that the Buick was associated with past and current criminal activity (the window tint violation, the noise violation, and the March 25 failure to comply), the officers lacked a reasonable suspicion of criminal activity by him specifically.

{¶ 29} Our resolution of this question rests on the trial court's factual determination as to whether Stanton was heading to the Buick. As stated above, Officer Lane testified that Stanton came out of the store, walked along the sidewalk, and stepped off the curb on the driver's side of the Buick. Lane indicated that Stanton then went "over to the driver's door of that car" and stopped. According to Lane, only after Stanton saw the officers did he turn around and start to walk toward the back of the parking lot. Lane stated that it was "our belief that he was probably the one driving the car so we went ahead and detained him." Based on Lane's testimony, the trial court reasonably found that Stanton "walked up to the car [the Buick]" and was not merely walking through the parking lot. With that factual finding, the officers had a reasonable suspicion that Stanton was the driver of the vehicle, and thus the officers were justified in stopping Stanton to investigate criminal violations connected with the Buick.

{¶ 30} Stanton's assignment of error is overruled.

### III. Conclusion

{¶ 31} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
John S. Pinard
Hon. Mary Katherine Huffman