[Cite as *State v. Fisher*, 2024-Ohio-3164.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230655 |
| | | TRIAL NO. B-2300877 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| MARQUELL TE'VON FISHER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 21, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1} After the trial court overruled his motion to suppress, defendant-appellant Marquell Te'von Fisher pleaded no contest to one count of carrying concealed weapons under R.C. 2923.12(A)(2). The trial court found him guilty and sentenced him to two years of community control. He now appeals that conviction, asserting a single assignment of error, in which he contends that the stop and seizure of his person was unreasonable under the Fourth Amendment. We find no merit in his assignment of error, and we affirm his conviction.

{¶2} The record shows that Hamilton County Sheriff's Deputy Nicholas Price was dispatched to investigate a robbery in progress at a Frisch's restaurant in Hamilton County, about 50 to 60 yards from the Warren County line. The area is mostly commercial but there are apartments within 50 to 100 yards of Frisch's.

{¶3} The dispatcher described the robber as a male black, wearing dark-colored clothing and a ski mask or some kind of face mask. When Deputy Price arrived at Frisch's, the restaurant's manager told him that a black male had come into to the restaurant, pointed a pink and black gun at him, and told him to take money from the safe. After the manager got some money from the safe, the robber left the restaurant. The manager said that the robber had fled on foot and went east toward an area which was mostly commercial properties, although there were also "residential homes."

{¶4} Deputy Price reviewed the restaurant's surveillance video and noted that the robber in the video "kind of lined up" with the description in the dispatch, except that the robber was wearing "gray-colored attire." He provided an updated description to dispatch, stating that the robber was "Black male, 6-foot tall, average build, wearing a zip-up Nike hoodie, with Nike emblem on left chest, possibly had gray boots on." He also noted some details that were not part of the description, including

that the robber appeared to be a biracial man, that the logo on the hoodie was red, and that the gun was pink and black.

{¶5} Deputy Noah Billmaier of the Warren County Sheriff's Department responded to a call from Hamilton County requesting assistance in setting up a perimeter. Because he was part of the K9 unit, he believed that he would be asked to have his dog track the robbery suspect. When he arrived, he discovered that Hamilton County's K-9 unit was already deployed. He stayed to assist in setting up the perimeter and went to an area east of Frisch's. He said that he was looking for a suspect described on his "dispatch screen" as an "African American male in a black hoodie and boots that fled the area after committing an armed robbery."

{¶6} The police set up a large perimeter that encompassed five or six blocks to the east of Frisch's. At about 1:15 a.m., about 45 minutes after Deputy Billmaier responded to the dispatch, he encountered Fisher "not even a football field length" from Frisch's. According to the deputy, "He had boots on, a black hoodie up over his head, and some type of stocking ski-type hat on top of his head." On cross-examination, the deputy acknowledged that Fisher was wearing a black hoodie with a large white emblem that was not a Nike logo, black boots, black jeans, and a light-colored cap.

{¶7} Deputy Billmaier said that what had initially drawn his attention to Fisher was that Fisher had been walking in an apartment complex, which was "a big U shape" with a female. The female immediately walked into the apartment, and Fisher "walks away and then walks up the sidewalk. He doesn't try to go to a car. He doesn't try to go to the apartment. He doesn't do anything." After the deputy made contact with him, he noticed that Fisher had dirt all over the front of his hooded sweatshirt, which he thought "was super weird, too."

3

{¶8}    Deputy Billmaier told Fisher that there had been an armed robbery in the area and that he matched the description of the robber. Fisher replied that it was not him. He had his hands in the pocket of his hoodie and would not take them out. The deputy asked, "Do you mind taking them out for our safety?" Fisher said that he would not do that, so the deputy "grabbed ahold of his arm and gently," walked him over to the front of his car, and had him take a seat on the "push guards," while the deputy "let the radio know" that he was "out with a suspect."

{¶9}    At some point, Fisher told the deputy that he had just come from the Meijer store, but the deputy suspected that was a lie, because Fisher had been walking from the west, which was "the opposite direction" of Meijer. Deputy Billmaier testified that at that time, he had reason to believe that Fisher matched the description of the armed-robbery suspect, and that people often lie when they are confronted by the police.

{¶10}  When another deputy arrived, Deputy Billmaier again asked Fisher to take his hands out of his pocket, but he refused. He had Fisher stand up so that he could conduct a pat-down search. But Fisher said, "No, bro, I'm not going to do that" and started to walk away. The deputy grabbed Fisher and put him against the hood of his cruiser. But Fisher continued to resist, engaging in "kind of a wrestling match," that "went down to the ground."

{¶11}  At that time, there were two other deputies with Deputy Billmaier. Fisher began screaming "at the top of his lungs to elicit a crowd response" from people that had come out from the apartment complex. The deputies were able to calm the crowd and subdue and handcuff Fisher. Deputy Billmaier asked him, "What is this about? Do you have warrants? You're not the guy who robbed [the restaurant]; why are you acting like this?" Fisher replied that he had a gun on him, and the deputies recovered a gun from Fisher's waistband.

**{¶12}** The deputies put Fisher into a cruiser and drove him to Frisch's, where Deputy Price had remained. When he saw Fisher, he immediately said, "That's not the guy we are looking for." He indicated that he was "very familiar with" Fisher, whom he called "Twin," so he recognized Fisher right away. He said that like the suspect in the video, Fisher was wearing "darker-colored clothing, but it was not exact." Deputy Price also said that the suspect in the video appeared to be biracial, which "was clearly not Twin."

**{¶13}** The trial court found that Deputy Billmaier's stop of Fisher was based on a reasonable and articulable suspicion that Fisher was involved in the robbery. Therefore, the trial court denied his motion to suppress. Subsequently, Fisher entered his no-contest plea.

**{¶14}** In his sole assignment of error, Fisher contends that the trial court erred in overruling his motion to suppress. He argues that under the collective-knowledge doctrine, the reasonableness of the stop and detention is based on the facts known by the law enforcement officer who precipitates the dispatch rather than what is known by the responding officer. He also argues that the stop and detention were unreasonable under the Fourth Amendment because Fisher did not match the description of the person who committed the robbery. This assignment of error is not well taken.

**{¶15}** Appellate review of a motion to suppress presents a mixed question of law and fact. We must accept the trial court's findings of fact as true if competent, credible evidence supports them. But we must independently determine whether the facts satisfy the applicable legal standard. *State v. Burnside*, 2003-Ohio-5372, ¶ 8; *State v. Houston*, 2020-Ohio-5421, ¶ 56 (1st Dist.).

**{¶16}** An investigative stop is a seizure within the meaning of the Fourth Amendment that must be supported by objective justification. *State v. Andrews*, 57

Ohio St.3d 86, 87 (1991); *Houston* at ¶ 57. The analysis is governed by the standards enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. *Andrews* at 87; *State v. Payne*, 2023-Ohio-4198, ¶ 8 (1st Dist.). *Terry* held that the police may stop and temporarily detain an individual for investigation "when an officer has reasonable suspicion based on specific and articulable facts that criminal activity has occurred or is imminent." *Payne* at ¶ 8, quoting *State v. Rogers*, 2022-Ohio-4535, ¶ 18 (1st Dist.).

{¶17} Reasonable suspicion is an "elusive concept," and "[p]recisely defining reasonable suspicion is not possible." It is not readily reduced to a "neat set of legal rules." *State v. Hawkins*, 2019-Ohio-4210, ¶ 20, quoting *Ornelas v. United States*, 517 U.S. 690, 695-696 (1996). It is a less demanding standard than probable cause. *Hawkins* at ¶ 20.; *In re J.C.*, 2019-Ohio-4815, ¶ 14 (1st Dist.). But it is something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Hawkins* at ¶ 20; *In re J.C.* at ¶ 14. The evaluation of the constitutionality of a stop should be based on the totality of circumstances "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Hairston*, 2019-Ohio-1622, ¶ 10, quoting *Andrews* at 87-88.

{¶18} In ruling on a motion to suppress, a court may consider the collective knowledge of police officers involved in a common investigation. *State v. Henderson*, 51 Ohio St.3d 54, 57 (1990); *Houston*, 2020-Ohio-5421, at ¶ 62 (1st Dist.). Police may rely on information broadcast over the police radio for reasonable suspicion to make an investigatory stop or for probable cause to make an arrest. *State v. Fultz*, 13 Ohio St.2d 79 (1968), paragraph two of the syllabus; *Houston* at ¶ 62.

{¶19} Where an officer making an investigatory stop relies solely on a dispatch, the state must demonstrate that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity. *Maumee v. Weisner*, 87 Ohio St.3d 295, 297-298 (1999); *Houston* at ¶ 62. "Reasonable suspicion may exist based upon the

collective knowledge of the police when there is reliable communication between the officer supplying the information and the officer acting on that information." *State v. Ojezua*, 2016-Ohio-2659, ¶ 30 (2d Dist.), quoting *State v. Freeman*, 2015-Ohio-2501, ¶ 16 (9th Dist.).

**{¶20}** We hold that the totality of the circumstances supports the conclusion that Deputy Billmaier had a reasonable suspicion of criminal activity sufficient to support the stop. The initial police dispatch described the robber as a black male, wearing dark-colored clothing and a ski or face mask. After Deputy Price, who had 17 years' experience, reviewed the surveillance video, he updated the dispatch to include more details, adding that the robber was a "Black male, 6-foot tall, average build, wearing a zip-up Nike hoodie, with Nike emblem on the left chest pocket, possibly had gray boots on."

**{¶21}** The details that Deputy Price knew but that were not in the dispatch are not dispositive. The information actually contained in the dispatch is what is relevant. While the best practice might be to include all information known by the police in the description of the suspect in the dispatch, ultimately the standard is whether under the totality of the circumstances, the police had a reasonable and articulable suspicion of criminal activity.

**{¶22}** Deputy Billmaier, who had 20 years of experience, recalled the description as being for a six-foot tall black male in a black hoodie and boots. About 45 minutes after the robbery and 50 to 100 yards away from Frisch's, he saw Fisher who was a black male about six feet tall, wearing a black hoodie, black jeans, black boots and some type of mask on his head. Thus, he was in close proximity to where the crime had occurred and close it time to when it had occurred. Further, Fisher caught the deputy's attention because he was walking with no apparent direction, and he had dirt all over the front of his sweatshirt, which he described as "super weird."

**{¶23}** Ultimately, the trial court stated, "I do not believe [Deputy Billmaier] was randomly picking out people in the neighborhood to stop." It found that "he made his stop based on what he believed was a reasonable and articulable suspicion that this person with the description that he had may have been involved in this particular crime of robbery." That finding was supported by competent, credible evidence.

**{¶24}** It does not matter that Fisher was later determined not to be the robber. An assessment of the totality of the circumstances "does not deal with hard certainties, but with probabilities." *Hairston*, 2019-Ohio-1622, at ¶ 10, quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981). A determination that reasonable suspicion exists "need not rule out the possibility of innocent conduct." *Hawkins*, 2019-Ohio-4210, at ¶ 22, quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002). In permitting detentions based on reasonable suspicions, "*Terry* accepts the risk officers may stop innocent people." *Hawkins* at ¶ 22, quoting *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). Consequently, we overrule Fisher's assignment of error and affirm the trial court's judgment.

Judgment affirmed.


**BERGERON, P.J.,** and **KINSLEY, J.,** concur.

Please note:
    The court has recorded its own entry this date.