[Cite as *State v. Metz*, 2021-Ohio-3060.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

State of Ohio                                     Court of Appeals No.  WM-20-008

　　　　Appellee                            Trial Court No.  19 CR 255

v.

Joshua A. Metz                              **DECISION AND JUDGMENT**

　　　　Appellant                          Decided:  September 3, 2021

* * * * *

Edward Stechschulte, for appellant.

* * * * *

**ZMUDA, P.J.**

## I.　　　Introduction

{¶ 1} This matter is before the court on appeal of the judgment of the Williams

County Court of Common Pleas, denying the motion to suppress of appellant, Joshua

Metz.  After appellant entered a no contest plea, the trial court sentenced him to three

years of community control and 180 days in jail, with all 180 days stayed, and imposed a $1,000 fine. For the reasons that follow, we affirm.

## II. Background and Procedural History

{¶ 2} On August 20, 2019, the combined assets of the Williams County Sheriff's Office, the Ohio Highway Patrol, the Village of Edon Police, and the six-county MANUNIT drug task force responded to reports of a potential abduction and hostage situation, identifying the alleged perpetrator as Anthony Arquette. The search for the alleged victim and Arquette included several cell phone "pings," an IP location trace on the alleged victim's computer, and alerts on several vehicles linked to Arquette. Two of those vehicles, a blue suburban and silver minivan, were titled to appellant, but the investigation yielded information that appellant had loaned the suburban to Arquette.

{¶ 3} Police eventually narrowed their search to the area north of Pulaski, and after several hours, Williams County Sheriff Deputy Doug Moser spotted the blue suburban and the silver minivan at the Graziani residence in Pulaski. Deputy Moser called for backup, and was instructed to remain on scene and prevent anyone from leaving. As he waited, he observed a man and a woman leave the house, enter a silver minivan, and begin exiting the driveway in the vehicle. Activating his lights, Deputy Moser blocked the minivan's exit from the driveway, near the road.

{¶ 4} Williams County Sheriff Lieutenant Greg Ruskey responded to the scene soon after, along with numerous other law enforcement officers. Lieutenant Ruskey assisted Deputy Moser in detaining the man and woman, identified as appellant and his

2.

wife, Cindy. Lieutenant Ruskey and Deputy Moser secured the two in "investigative detention," and advised them they were not free to go. Deputy Moser removed objects from appellant's pockets and placed him in the back of his cruiser, in handcuffs. The deputies questioned appellant and his wife, separately, trying to locate the alleged abduction victim. They learned that the alleged victim and her boyfriend, Arquette, were inside the house. Brian Graziani exited the house during this questioning, and he, too, was detained.

{¶ 5} For the next 15-30 minutes, appellant, Cindy, and Graziani remained in "investigative detention" at the scene while the gathered law enforcement engaged in negotiations to remove the targets of their manhunt from the home. Eventually, it became clear that no abduction had occurred, but Arquette had active warrants. Deputy Moser was assigned to take Arquette into custody and transport him to the jail. Deputy Moser then removed appellant from the back of his cruiser, removed appellant's handcuffs, returned all items taken from appellant's pockets but mistakenly kept his identification, and told appellant he was free to go. Cindy was released, as well.

{¶ 6} Appellant and Cindy returned to their minivan and waited for the exit to clear. As soon as Deputy Moser drove off, clearing the way to the road, Graziani's mother arrived and pulled in right behind appellant's vehicle. Law enforcement vehicles were parked on either side of appellant, and he did not feel he could ask Mrs. Graziani to move or ask permission to drive through the grass to reach the road. Appellant remained

3.

at the scene, seated in the driver's seat of his minivan while Cindy sat in the shade of a nearby tree.

{¶ 7} At this point, while appellant was free to go but blocked by vehicles, the focus of law enforcement turned to the Graziani's home. In the course of negotiating Arquette's surrender, Lieutenant Ruskey and others smelled the odor of burnt marijuana emanating from the house. He requested consent to search the home, but the Grazianis declined at first, consenting only after learning a warrant would be obtained. Lieutenant Ruskey also learned that appellant wished to leave, but had been asked for consent to search his minivan first, to "make sure nothing illegal from the house was leaving the property." Appellant gave consent and signed a consent to search card, but deputies did not search his vehicle.

{¶ 8} Instead, just after appellant signed the consent card in preparation for leaving, Williams County Sheriff Deputy Michelle Jacob arrived.[1] Deputy Jacob observed appellant, sitting in his car with the door open. As she approached, she noticed appellant reach toward his waistband or pocket area, and it caused her concern for officer safety. Deputy Jacob asked appellant to step out of the minivan, voicing her safety concerns. When appellant complied, Deputy Jacob saw the top of a Ziploc bag sticking out of the same pocket to which appellant had been reaching. Deputy Jacob pulled the

---

[1] Deputy Jacob had been on scene earlier for a brief time, but left to obtain a search warrant for the house. After she was just a few miles away, the Grazianis consented to a search of their home, and Deputy Jacob was called back to the scene.

4.

Ziploc the rest of the way out and observed "dirty looking meth," later tested and confirmed as methamphetamine.

{¶ 9} Appellant was charged with aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(a). He was arraigned on January 13, 2020, and entered a plea of not guilty. On February 4, 2020, appellant moved to suppress the evidence, seized from his pocket without a warrant. On March 11, 2020, the trial court held a hearing on the motion to suppress. Deputy Moser, Lieutenant Ruskey, Deputy Jacob, appellant, and Cindy each testified regarding the events of August 20, 2019.

{¶ 10} Deputy Moser recounted the events regarding his arrival on scene, detention of appellant, Cindy, and Brian Graziani with Lieutenant Ruskey's assistance, and eventual exit with Arquette in custody. He also indicated he returned some tattoo tools, taken from appellant's pocket, and told appellant he was free to go. Deputy Moser forgot to return appellant's identification, and did not return a folding knife, stuck in the ground near another deputy for safekeeping.

{¶ 11} Lieutenant Ruskey testified that he assisted in detaining appellant, his wife, and Graziani, and after smelling marijuana emanating from the house, requested Deputy Jacob come to the scene to assist investigating possible narcotics use. When questioned regarding his request to search appellant's vehicle, Lieutenant Ruskey testified as follows:

> Q: Do you remember the exact words you used or a general colloquy?

5.

A: Yeah, normally we just say while we're here, you know suspected drug use going on inside the residence, before you guys leave we'd like to take a look through your vehicle, make sure there isn't anything illegal inside the vehicle.

Q: At that time, would the Metz's have been handcuffed?

A: I don't believe they were handcuffed.

Q: Had you returned their property to them?

A: I don't recall having any of their property. He had a knife that was stuck in the ground just for safekeeping by Deputy Moser but I don't recall, I personally don't recall taking any of their property.

Lieutenant Ruskey testified that appellant gave consent to search his vehicle prior to the Grazianis giving consent to search their house.

{¶ 12} Deputy Jacob testified that she arrived on scene after Deputy Moser took Arquette away. She indicated she is the narcotics officer, and was responsible for obtaining a search warrant for the home that day. She never asked to search appellant's vehicle. Instead, as she arrived and walked toward Lieutenant Ruskey, who was her superior at the scene, she immediately noted appellant make a movement toward his waist or pocket, and told appellant, "You're making me worry, could you step out of the vehicle?" Once appellant stepped out, Deputy Jacob recognized the Ziploc bag as common storage for drugs. She removed the bag, tested it, and advised appellant it was meth. Appellant admitted he had been trying to hide it and denied it was his.

6.

{¶ 13} Appellant testified that he and Cindy went to the house to give Graziani a tattoo, and were just leaving when Deputy Moser blocked their vehicle and detained them. He acknowledged that Deputy Moser eventually told him he was free to go, but his vehicle remained blocked for about 5-10 minutes while Deputy Moser secured Arquette for transport. As soon as Deputy Moser drove off, Graziani's mother pulled in behind him, blocking him again. Mrs. Graziani and her son were then busy speaking to the officers that wished to search the home. Cindy felt overheated in the minivan and exited the vehicle to sit in the shade of a nearby tree. Appellant, also, did not want to leave without his folding knife, which held sentimental value. At this point, appellant testified, he was no longer trying to leave.

{¶ 14} When Deputy Jacob arrived, appellant claimed she never spoke to him and there was no "making me nervous" talk. Instead, appellant testified that Deputy Jacob "motioned with her finger" and directed him out of the minivan. She then pulled the bag from his pocket.

{¶ 15} Cindy's testimony was similar to appellant's, with one notable exception. Cindy indicated that Deputy Jacob asked appellant "what's that in your pocket," a couple of times. In response, Cindy stated, appellant handed Deputy Jacob what was in his pocket.

{¶ 16} The trial court held the motion in abeyance, permitting the parties to file proposed findings of fact and conclusions of law. On May 27, 2020, the trial court denied the motion by written decision.

7.

{¶ 17} The trial court determined appellant and his wife were no longer in "investigative detention," but were nevertheless unable to leave as their car was blocked by law enforcement and non-law enforcement vehicles parked around their minivan. The trial court also determined that Deputy Jacob encountered appellant within the "first three minutes of her arrival at the scene" and she was unaware that appellant had previously been detained by Deputy Moser. Noting Deputy Jacob's extensive experience in law enforcement and her six years serving with the narcotics task force, the trial court determined Deputy Jacob alerted to appellant's movement, ordered appellant out of his vehicle for officer safety, and identified the Ziploc bag as a "common method of storing and transferring illegal drugs or narcotics." Deputy Jacob's account of events, moreover, was corroborated by Cindy Metz, who testified the deputy asked appellant "what is that in your pocket?"

{¶ 18} While the trial court determined the search of appellant's pocket occurred during an investigatory detention, the court also acknowledged the "chaotic scene" that day, and judged Deputy Jacob's conduct in light to the totality of the circumstances. At the time Deputy Jacob encountered appellant, sitting in his vehicle with the door open, law enforcement had investigated a potential hostage situation, searched for Arquette to arrest him on an outstanding warrant, and investigated the presence of illegal drugs at the house. The trial court deemed Deputy Jacob's command to appellant to exit his vehicle for officer safety appropriate, based on appellant's "furtive movement," and determined the Ziploc bag observed by Deputy Jacob was evidence in plain view.

8.

{¶ 19} After the trial court's denial of his motion to suppress, appellant changed his plea and entered a plea of no contest to the single count of aggravated possession of drugs. The trial court sentenced appellant to three years of community control and 180 days in the Corrections Center of Northwest Ohio, with all 180 days stayed. The trial court also imposed a $1,000 fine.

{¶ 20} Appellant filed a timely appeal of this judgment.

### III. Assignments of Error

{¶ 21} Appellant now asserts a single assignment of error, with three issues for review, as follows:

> The Trial Court erred when it denied Appellant's Motion to Suppress.

### IV. Analysis

{¶ 22} Appellant argues that the evidence taken from his pocket should have been suppressed, raising arguments relative to the intrusion in removing him from his vehicle, the inadvertent discovery of contraband in "plain view," and the propriety of the field test of the evidence. In response, the appellee, the state of Ohio, filed no appellate brief.

{¶ 23} Our review of a decision, denying a motion to suppress, "presents a mixed question of law and fact." *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. In reviewing the ruling, we accept – as true – the trial court's factual findings if they are supported by credible evidence in the record, and "independently determine, without deference to the conclusion of the trial court, whether the facts satisfy

9.

the applicable legal standard." *Burnside* at ¶ 8, citing *State v. McNamara,* 124 Ohio App.3d 706, 711, 707 N.E.2d 539 (4th Dist.1997).

{¶ 24} The Fourth Amendment protects an individual's "subjective expectation of privacy if that expectation is reasonable and justifiable." (Citation omitted.) *State v. Buzzard,* 112 Ohio St.3d 451, 2007-Ohio-373, 860 N.E.2d 1006, ¶ 14. An individual fails to preserve that privacy, however, by 'leaving an object in the plain view of the public." *Id.* at ¶ 15, citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

{¶ 25} The "plain view" doctrine provides an exception to the warrant requirement, permitting seizure of "evidence, instrumentalities or fruits of a crime without the necessity of having first obtained a search warrant specifically naming such items." (Citation omitted.) *State v. Williams,* 55 Ohio St.2d 82, 84, 377 N.E.2d 1013 (1978). The requirements for "plain view" are "(1) the initial intrusion which afforded the authorities the plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent to the seizing authorities." *Id* at paragraph one of the syllabus.

{¶ 26} Appellant raises issues that align with the requirements for seizure of evidence that is in "plain view." He argues the illegality of the intrusion, pretext for the search, and the benign nature of the baggie prior to the deputy's intrusion within a "closed container." We address each issue in turn.

10.

**Lawful Intrusion**

{¶ 27} In challenging the trial court's decision, appellant first argues that the investigatory detention lasted far beyond the time appropriate for a *Terry* stop, and therefore, the intrusion permitting plain view of the baggie was not lawful. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures." *State v. Hairston,* 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, ¶ 9; *see also* Ohio Constitution, Article I, Section 14.

{¶ 28} An officer may perform a *Terry* stop if that officer has "a reasonable suspicion based on specific and articulable facts that criminal behavior has occurred or is imminent." *Hairston* at ¶ 9, citing *Terry,* 392 U.S. at 30. The "reasonable-suspicion" standard requires less than the threshold for probable cause, with determination based on the totality of circumstances as viewed by the reasonable and prudent police officer, observing the scene and reacting to unfolding events. *Hairston* at ¶ 10, citing *United States v. Sokolov,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2ds 1 (1989); *State v. Andrews,* 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 29} As an initial matter, we note that the trial court determined that, "from the perspective of the [appellant], they couldn't drive away" and the "'investigatory stop' continued." However, the record does not support this conclusion. Appellant testified that, once Deputy Moser drove off, *Mrs. Graziani* blocked his egress and he chose not to ask her to move her car or drive through the grass to reach the road. Furthermore, he

acknowledged that – by the time Deputy Jacob arrived – he was no longer trying to leave. Therefore, we disagree with the trial court's conclusion that the "investigatory stop" continued after Deputy Moser left the scene. Because the trial court's decision focused only on Deputy Jacob's conduct, however, without regard for the initial detention by Deputy Moser, we find the trial court correctly applied the law in denying appellant's motion to suppress.

{¶ 30} Appellant first argues the duration of his non-consensual detention went beyond that which would have been permitted for an investigative stop pursuant to *Terry*. However, his argument relies on a misstatement of the facts, as demonstrated by testimony at the suppression hearing. For example, while Deputy Moser did retain appellant's identification and law enforcement vehicles were parked around appellant's minivan, as argued by appellant, by the time Deputy Jacob arrived appellant had – by his own admission – abandoned his attempt to leave and consented to a search of his minivan. Furthermore, it appeared that appellant's departure was not imminent, as his wife was outside the vehicle, relaxing under a nearby tree.

{¶ 31} The only detention, relevant in this case, arose from Deputy Jacob's contact with appellant. This was the only contact examined by the trial court relative to the evidence seized in appellant's case. Despite concluding there was a continuous detention, the trial court noted Deputy Jacob's arrival to the "crazy" scene to investigate a suspected drug house, and her immediate officer safety concerns, unrelated to any initial detention. Specifically, the trial court noted that the scene began as a potential hostage

crisis, pivoted to an arrest of Arquette on warrants, and ended with a drug investigation, targeting the Graziani house. The trial court determined that Deputy Jacob removed appellant from his vehicle after viewing suspicious movement causing safety concerns, unrelated to any prior detention.

{¶ 32} The trial court, in this case, properly analyzed Deputy Jacob's conduct based on her observation of appellant's furtive movement at the scene of a drug investigation. While appellant argues pretext, his wife corroborated the deputy's stated concern over what he had in his pocket. A brief stop for a limited, protective inquiry was reasonable in these circumstances. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *State v. Bobo*, 37 Ohio St.3d 177, 180-181, 524 N.E.2d 489 (1988), quoting *Terry*, 392 U.S. at 24, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 33} Recognizing the evolving circumstances that day, the trial court considered the propriety of Deputy Jacob's reaction based solely on the circumstances she observed at the scene of a drug investigation: a man, sitting in a minivan, reaching for or making furtive movement toward his pocket. The ongoing detention, accordingly, was not part of the trial court's analysis into reasonable suspicion as it related to Deputy Jacob's command to exit the vehicle. The circumstances observed by Deputy Jacob, moreover,

13.

did justify a brief stop to ensure appellant was not armed or posing any threat. Appellant's argument regarding the lawfulness of the stop, accordingly, lacks merit.

**Inadvertent Discovery**

{¶ 34} Appellant next argues that the trial court misapplied the "plain view" doctrine, challenging the motive of Deputy Jacob in ordering him from his vehicle and the inadvertent discovery of contraband in "plain view." In contrast to the deputy's testimony, appellant argues Deputy Jacob conducted a warrantless search to discover evidence of a crime, an argument lacking any support in the record.

{¶ 35} This challenge relies on appellant's disagreement with Deputy Jacob's testimony. However, the trial court was in the best position to evaluate that testimony and consider the deputy's credibility. The trial court was also free to find that testimony more credible than appellant's. *State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 15, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992), citing *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982); *State v. Moore*, 81 Ohio St.3d 22, 31, 689 N.E.2d 1 (1998).

{¶ 36} Here, the record demonstrates that Deputy Jacob asked appellant to step from his vehicle based on her concerns for officer safety. Deputy Jacob testified that she viewed and immediately recognized the incriminating nature of the plastic baggie, protruding from appellant's pocket, occurring at the scene of an ongoing drug investigation. Specifically, she testified on direct:

14.

So I responded to the scene. * * * I walked over to Lieutenant Ruskey which was standing beside [appellant's] vehicle, I think it was a van. [Appellant] was seated in the driver's seat. There was nobody in the passenger seat. The door was open. I approached Lieutenant Ruskey and asked him for an update, which is what's going on? While I was speaking with Lieutenant Ruskey, I saw [appellant] make some motion toward his waistband, pocket area that made me very uncomfortable as far as safety concerns. So I asked [appellant] if he would step out of the vehicle because I felt uneasy. I think I said to him I don't like the movements you're making. You're making me worry, could you step out of the vehicle? When he stepped out of the vehicle and actually stood up, I saw the top of a zip lock bag sticking out of the pocket that he was making the motion by. In my training and experience, I know that zip lock bags are a common way to store drugs.

{¶ 37} On cross examination, Deputy Jacob reiterated her concern for officer safety, demonstrating the way appellant moved, stating, "And see my weapons right there. That's what I'm saying, when he's doing this, he's seated and he's doing this." Deputy Jacob also emphasized her training and experience in recognizing drugs, stating, "I was seeing drugs in plain view" based on the baggie protruding from appellant's pocket prior to removing it the rest of the way.

15.

{¶ 38} Appellant disputes Deputy Jacob's testimony as credible, but the trial court clearly disagreed. In denying the motion to suppress, the trial court found the deputy's account regarding her concern for safety and the immediately apparent nature of the baggie as indicative of drugs, considering the circumstances observed by her that day, to be credible. Other jurisdictions have reached the same conclusion, and determined that trained officers might view a partially visible, plastic baggie as an immediately apparent indication of illegal drugs. *See e.g. State v. Strothers,* 2d Dist. Montgomery No. 18322, 2000 WL 1867594 (Dec.22, 2000) (officer entitled to seize and/or search baggie sticking out of a sweat-jacket pocket, based on the immediately apparent, incriminating nature of the baggie at the scene of a drug investigation); *State v. Barr,* 86 Ohio App.3d 227, 234, 620 N.E.2d 242 (8th Dist.1993) (based on circumstances, police "possessed the required probable cause to associate the visible plastic bag with criminal activity); *State v. Brown,* 10th Dist. Franklin No. 18AP-754, 2019-Ohio-3160, (baggie protruding from closed hand, outside a known drug house, constituted evidence of drugs in plain view, providing probable cause for detention); *State v. Simmons,* 2013-Ohio-5088, 5 N.E.3d 670 (12th Dist.) (less than an inch of a clear plastic baggie protruding from defendant's hand sufficient to support reasonable articulable suspicion of drug activity, justifying stop).

{¶ 39} In disputing "plain view," appellant offers only his difference of opinion regarding the significance of a Ziploc baggie at the scene of a drug investigation. Appellant also argues, without support from the record, that "the search was not performed to search for weapons," in contrast to Deputy Jacob's testimony that she was

16.

concerned for officer safety after observing appellant reaching toward his waist or pocket in a furtive manner. Appellant further contends that a "pat-down" is limited to a search for weapons and does not extend to evidence of a crime. There was no "pat-down" performed in this case. Moreover, even if Deputy Jacob had performed a pat-down, the frisk allowed under *Terry* has been extended to permit seizure of nonthreatening contraband detected within the confines of a *Terry* search. *State v. Purley,* 6th Dist. Wood No. WD-18-011, 2019-Ohio-3931, ¶ 40, citing *Minnesota v. Dickerson,* 508 U.S. 366, 373-375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (additional citation omitted.).

{¶ 40} Considering the record in this case, with deference to the trial court's determination that Deputy Jacob had a concern for officer safety and recognized the baggie as an immediately apparent indication of illegal drugs, we find no error in application of the "plain view" doctrine in this instance.

**Apparent Contraband and Field Test**

{¶ 41} In his final argument, appellant argues that the trial court should have suppressed evidence of methamphetamine because Deputy Jacob performed a field test without a warrant, characterizing the field test as a search of a closed container. However, a field test of an apparent illicit substance, visible within the Ziploc baggie, was not a search implicating any privacy interest, and appellant identifies no "closed container" referenced anywhere in the record.

{¶ 42} We previously determined that the baggie was in plain view, sticking out of appellant's pocket, and therefore, properly seized without a warrant. The issue, therefore,

17.

is whether the field test constituted a search that infringed upon a legally protected privacy interest. The United State Supreme Court has determined there is no legitimate privacy interest violated by a field test to identify the presence of drugs, once properly seized. *See United States v. Jacobsen,* 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).

{¶ 43} In *Jacobsen,* employees of a private freight carrier discovered a badly damaged package, revealing a white powdery substance concealed inside layers of wrapping. They notified the Drug Enforcement Agency and an agent removed some of the powder to perform a field test, which confirmed the substance was cocaine. *Jacobson* at 111. The defendant filed a motion to suppress, arguing, in part, that the field test was a warrantless search and seizure. The trial court denied the motion, the defendant was convicted, and the issue was subsequently certified to and accepted by the United States Supreme Court for review "because field tests play an important role in the enforcement of the narcotics law[.]" *Jacobson* at 113.

{¶ 44} The Fourth Amendment protects "two types of expectations, one involving 'searches,' the other 'seizures.'" *Id.* A search involves an infringement of "an expectation of privacy that society is prepared to consider reasonable[.]" *Id.* A seizure results from "meaningful interference with an individual's possessory interests in that property." *Id.* The Court in *Jacobson* determined a private actor – the freight carrier's employee – first viewed the white powder inside the package, and the agent's subsequent inspection of the package "enabled the agent to learn nothing that had not previously

been learned during the private search." *Id* at 120.  Therefore, inspecting the package was not deemed a "search" that implicated the Fourth Amendment.  *Id.*

{¶ 45} Removing a baggie containing white power, furthermore, was not deemed a search in violation of any Fourth Amendment protection.  Based on the condition in which the agent viewed the package, "the package could no longer support any expectation of privacy; it was just like a balloon 'the distinctive character [of which] spoke volumes as to its contents, particularly to the trained eye of the officer."  The agent could temporarily seize the package, without a warrant, as an object containing apparent contraband.  *Id.* at 121, citing *United States v. Place,* 462 U.S. 696, 700, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (additional citations omitted.).

{¶ 46} The field test of the white powder, likewise, did not constitute a "search" or a "seizure" for purposes of the Fourth Amendment.  In reaching this conclusion, the Court in *Jacobsen* reasoned:

> The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful "search" or "seizure" within the meaning of the Fourth Amendment.

> The field test at issue could disclose only one fact previously unknown to the agent – whether or not a suspicious white powder was cocaine.  It could tell him nothing more, not even whether the substance was sugar or talcum powder.  We must first determine whether this can be

considered a "search" subject to the Fourth Amendment-did it infringe an expectation of privacy that society is prepared to consider reasonable?

The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities. Indeed, this distinction underlies the rule that Government may utilize information voluntarily disclosed to a governmental informant, despite the criminal's reasonable expectation that his associates would not disclose confidential information to the authorities. *See United States v. White*, 401 U.S. 745, 751-752, 91 S.Ct. 1122, 1125-1126, 28 L.Ed.2d 453 (1971) (plurality opinion).

A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative – merely disclosing that the substance is something other than cocaine – such a result reveals nothing of special interest. Congress has decided – and there is no question about its power to do so – to treat the interest in "privately" possessing

cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

* * *

We have concluded * * * that the initial "seizure" of the package and its contents was reasonable. Nevertheless, as *Place* also holds, a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on "unreasonable seizures." Here, the field test did affect respondents' possessory interests protected by the Amendment, since by destroying a quantity of the powder it converted what had been only a temporary deprivation of possessory interests into a permanent one. To assess the reasonableness of this conduct, "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." * * *

Applying this test, we conclude that the destruction of the powder during the course of the field test was reasonable. The law enforcement interests justifying the procedure were substantial; the suspicious nature of the material made it virtually certain that the substance tested was in fact contraband. Conversely, because only a trace amount of material was

involved, the loss of which appears to have gone unnoticed by respondents, and since the property had already been lawfully detained, the "seizure" could, at most, have only a *de minimis* impact on any protected property interest.

*Jacobsen*, 466 U.S. at 122–125, 104 S.Ct. 1652, 80 L.Ed.2d 85, citing *Place,* 462 U.S. at 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (additional citations omitted.).

{¶ 47} In this case, Deputy Jacob seized the baggie as contraband, in plain view. She immediately suspected the baggie contained "dirty looking meth" based on its appearance, and a field test confirmed the presence of methamphetamine. As in *Jacobsen,* the nature of the baggie as contraband was apparent to Deputy Jacob, a trained officer serving with the drug task force. The field test, moreover, implicated no privacy right as the law protects no privacy interest in the possession of an illicit drug, and the test itself would indicate only whether the substance was as expected – methamphetamine – and nothing more. Accordingly, Deputy Jacob did not need a warrant to conduct a field test under the circumstances.

{¶ 48} Therefore, upon due consideration of the record in this case, we find no error in the trial court's denial of appellant's motion to suppress. Appellant's sole assignment of error is found not well-taken.

22.

## V.    Conclusion

**{¶ 49}** For the forgoing reasons, we affirm the judgment of the Williams County Court of Common Pleas.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.
_____
JUDGE

Gene A. Zmuda, P.J.

Myron C. Duhart, J.
CONCUR.
_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.