**[J-7-2023] [OISA: Brobson, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 24 EAP 2022 |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Superior Court entered on |
| | : | December 21, 2021 at No. 560 EDA |
| v. | : | 2021 (reargument denied February |
| | : | 16, 2022) vacating and remanding |
| | : | the Order entered on February 11, |
| KEVIN JACKSON, | : | 2021 in the Court of Common Pleas, |
| | : | Philadelphia County, Criminal |
| | : | Division at No. CP-51-CR-0000888- |
| Appellant | : | 2020. |
| | : | |
| | : | ARGUED: March 8, 2023 |

## OPINION IN SUPPORT OF REVERSAL

**JUSTICE WECHT**                                          **DECIDED: September 28, 2023**

It's 8:00 pm. in a Philadelphia neighborhood. You just finished a great dinner with your oldest and dearest friend. The wine was good, too. You stagger and stumble just a bit as you walk out of the restaurant and into the cool night air. You turn onto the sidewalk and begin the trek to your apartment five blocks away. Your mind wanders back to the meal, the wine, and the company.

BANG!

BANG!

BANG!

Gunshots. Three of them erupt from the alley across the street. You don't have time to look and see who fired them. There is only one thought in your head: RUN! You take off.

Around the corner, a police officer patrols the dark streets in a marked cruiser. A routine, boring shift suddenly transforms into an adrenaline-fueled commotion as the three loud pops pierce the tranquil night air. The officer activates the siren and emergency lights, hits the accelerator, and speeds off in the direction of the gunshots.

The police car squeals to a stop when the officer sees you racing around the corner, fleeing the area from where the gunshots rang out. You are not bleeding. You are not holding a gun. You do not toss anything aside. You are not pointing, screaming, or calling for help. Your singular focus is getting away from the danger.

The officer calls out to you. Although he heard the same shots that you heard, he asks you why you are running. You tell the truth: "I am running from the gunshots!" You don't stop. You don't ask for help. You just want to put as much distance as possible between you and the deadly gunfire.

Today's Opinion in Support of Affirmance ("OISA") declares that, because you are running away, it is reasonable for a police officer to suspect that you are the shooter. The OISA would hold that, because you are alone and you did not stop to ask for help, you have "connected" yourself to "the criminal activity at issue."[1] Through the OISA's eyes, your objectively reasonable, expected, and normal reaction to a dangerous situation was, to the contrary, criminally suspicious. Police officers would be free to seize and investigate you, notwithstanding the absence of any objective indicia that you were in any way involved in the suspected crime.

Per today's decision, had you been with someone else, instead of on your own, the police officer could not have stopped you, presumably even if that other person also was fleeing from the dangerous situation. Or, had you merely asked the police officer for help, instead of getting as far away as possible from an active shooter, the officer could

---

[1] *See* OISA at 22.

not have stopped you.  But you were alone, and you passed the officer by in your frantic effort to protect yourself.  Thus, according to the OISA, you are a suspect.

This holding pushes the *Terry*[2] stop far beyond what the Supreme Court of the United States intended it to be:  a limited exception to the requirement that police officers must have probable cause before arresting an individual.  The sweeping law enforcement tool that the OISA endorses today would be unrecognizable to the Justices that decided *Terry* in 1968.  Our Constitutions do not permit such expansive police power.  I dissent.

Before *Terry*, the analytical framework for ascertaining whether an interaction between the police and a private individual was constitutionally reasonable[3] was "relatively simple and straightforward."[4]  The sole inquiry was whether the interaction was an arrest supported by probable cause.[5]  A "seizure" for Fourth Amendment purposes was treated as synonymous with an "arrest," and "the requirement of probable cause . . . was treated as absolute."[6]  Probable cause embodied "the best compromise that has been found for accommodating [the] often opposing interests" in "safeguard[ing] citizens from rash and unreasonable interferences with privacy" and in "seek[ing] to give fair

---

[2]    *Terry v. Ohio*, 392 U.S. 1 (1968).

[3]    The Fourth Amendment provides:  "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause . . . ."  U.S. CONST. amend IV.  The Fourth Amendment is applicable to the states via the Fourteenth Amendment.  *See Mapp v. Ohio*, 367 U.S. 643 (1961).  It has become well-entrenched in the United States Supreme Court's precedents that the "touchstone of the Fourth Amendment is reasonableness," *Florida v. Jimeno*, 500 U.S. 248, 250 (1991), and that "[r]easonableness, in turn, is measured in objective terms by examining the totality of the circumstances."  *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

[4]    *Dunaway v. New York*, 442 U.S. 200, 208 (1979).

[5]    *Id.*

[6]    *Id.* (footnotes and citations omitted).

leeway for enforcing the law in the community's protection."[7] "The standard of probable cause thus represented the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest reasonable under the Fourth Amendment" and applies "to all arrests, without the need to balance the interests and circumstances involved in particular situations."[8]

Simply put, prior to 1968, the Fourth Amendment to the United States Constitution did not recognize, let alone countenance, concepts such as an "investigative detention." "Reasonable suspicion" did not exist in the constitutional rubric. Then came *Terry*.

The facts of *Terry* are well-known. Terry and another man were standing at the intersection of two streets in Cleveland, Ohio. Their loitering piqued the investigative senses of an experienced police officer.[9] The officer kept his well-trained eye on the pair until one of them walked along the street, looked in a store window, continued on, turned around, and then peered into the same store window on the way back.[10] Once the first man returned to the corner, the other walked along the same street and looked in the same window. Alternating one at a time, the men did this five or six times each. A third man joined the pair, spoke briefly with them, and then walked off. Terry and his cohort continued to pace on the street for a short while longer, and then walked away in the direction of the third man. The officer followed, and saw the two meet the third man.

The officer contemplated the actions that he had just observed and concluded that the men were "casing a job, a stick up."[11] The officer decided to investigate further.

---

[7] *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

[8] *Dunaway*, 442 U.S. at 208 (internal quotations and citation omitted).

[9] *Terry*, 392 U.S. at 5.

[10] *Id.* at 6.

[11] *Id.*

Fearing that the trio was armed, the officer believed that "direct action" was necessary.[12] He approached the group, identified himself as a police officer, and asked them to identify themselves. When Terry mumbled something, the officer grabbed him, spun him around to face the other two suspects, patted the outside of Terry's clothing, and found a pistol.[13] The officer's actions would change law enforcement tactics and constitutional law forever.

Terry's challenge to the seizure of the pistol eventually reached the Supreme Court of the United States, which addressed the "narrow question" of "whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest."[14] The question presented the Court with two competing interests. On one hand, the Court recognized, law enforcement officials must have flexibility in order to address the "rapidly unfolding and often dangerous situations on city streets."[15] On the other hand, the "traditional jurisprudence of the Fourth Amendment" strictly circumscribed police authority, and previously had imposed "a severe requirement of specific justification for any intrusion" upon a person's protected privacy interests.[16] The Court sought to strike a balance between these two important interests.

The Court "emphatically reject[ed]" the notion that the stop and frisk at issue did not rise to the level of a seizure for Fourth Amendment purposes.[17] To the contrary, the Court emphasized, even a brief, investigative detention "is a serious intrusion upon the

---

[12]    *Id.* at 6-7.

[13]    *Id*. at 7.

[14]    *Id.* at 15.

[15]    *Id.* at 10.

[16]    *Id.* at 11.

[17]    *Id.* at 16.

sanctity of the person, which may inflict great indignity and arouse strong resentment."[18] However, that an investigatory detention constituted a seizure did not mean that the officer first had to obtain a search warrant. This newly sanctioned type of police conduct differed significantly from that which traditionally had been subject to the warrant requirement. Such unplanned investigative detentions were an "entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure."[19] Thus, the Court explained, the "conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures," not against the warrant requirement.[20]

For a detention predicated upon something less than probable cause to be reasonable, the Court ruled, a law enforcement officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[21] The Court further explained that judges must assess those facts "against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?"[22]

After identifying and evaluating the interests on both sides of the case, *i.e.*, the needs of law enforcement in addressing evolving and dangerous situations versus the privacy interests of individuals, the Court concluded that the "proper balance" of those

---

[18]     *Id.* at 17.

[19]     *Id.* at 20.

[20]     *Id.*

[21]     *Id.* at 21 (footnote omitted).

[22]     *Id.* at 21-22 (internal quotation marks, citations, and footnote omitted).

interests required the recognition of a "narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."[23] Thus, the *Terry* stop and frisk was born.

Given its familiarity in modern police practice, it is all too easy to forget that *Terry* created an exception to the Fourth Amendment's requirements. *Terry* is not the general rule.[24] It is even easier to overlook the fact that the Supreme Court steadfastly "has been careful to maintain" the exception's "narrow scope."[25] Indeed, *Terry*'s "application of [a] balancing test led the Court to approve this *narrowly* defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons."[26] It is precisely because of the limited applicability of this "narrowly defined" seizure that the OISA correctly recognizes that *Terry* stops exist for the purposes of confirming or dispelling criminal suspicions, not for identification of potential victims of a crime or interrogation of potential witnesses.[27] The Supreme Court has made it abundantly clear that *Terry* stops pass constitutional muster only when "criminal activity

---

[23] *Id.* at 27.

[24] *See Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (explaining that "[t]he *Terry* case created an exception to the requirement of probable cause"); *Dunaway*, 442 U.S. at 208-09 ("*Terry* for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause."); *id.* at 210 ("Because *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope.").

[25] *Ybarra*, 444 U.S. at 93 (quoting *Dunaway*, 442 U.S. at 210).

[26] *Dunaway*, 442 U.S. at 210 (emphasis added).

[27] *See* OISA at 21 ("[W]e examine the totality of the circumstances at issue to determine whether there were particularized and objective grounds upon which to suspect that the individual detained was, or was about to be *engaged in criminal activity*.") (emphasis added).

may be afoot,"[28] or, stated otherwise, when the objective circumstances indicate that "the person stopped is, or is about to be, engaged in criminal activity."[29]  Investigative detentions are a "*sui generis* rubric of police conduct"[30] enabling a pat down for weapons while police officers conduct a brief investigation into suspected criminal activity.[31]  They are not boundless law enforcement tools to be deployed at the whim or convenience of a police officer.

In *Commonwealth v. Bryant*,[32] our Superior Court pushed *Terry* far beyond its intended limits.  There, a police officer heard six gunshots and saw three men running from the general vicinity whence the shots had originated.[33]  As the three men rounded a corner and emerged onto a street, the officer noticed that no one else on that well-populated street was running.  The officer pursued the three men and conducted a *Terry* stop, during which the officer found narcotics in Bryant's front pants pocket.[34]

The Superior Court held that the officer possessed reasonable suspicion to stop Bryant because he "could have concluded reasonably that [Bryant] was a perpetrator, *victim, or eyewitness* of a possible shooting."[35]  The Supreme Court of the United States

---

[28]     *Terry*, 392 U.S. at 30.

[29]     *United States v. Cortez*, 449 U.S. 411, 417 (1981) (citations omitted).

[30]     *Dunaway*, 442 U.S. at 209 (citations and quotation marks omitted).

[31]     *See Brown v. Texas*, 443 U.S. 47 (1979) (limiting *Terry* stops to situations in which a suspect "engaged or had engaged in criminal conduct").

[32]     866 A.2d 1143 (Pa. Super. 2005).

[33]     *Id.* at 1144-45.

[34]     *Id.* at 1145.

[35]     *Id.* at 1147 (emphasis added).

has never endorsed such sweeping police authority.[36]  Nor has this Court.  To do so would transform *Terry* from the narrow, *sui generis* exception into a limitless power that threatens to strip the constitutionally protected privacy rights of all persons who find themselves somewhere near an area in which a suspected crime has occurred.

The OISA rightly rejects the Superior Court's reliance upon *Bryant* in this case. But the OISA would not go far enough.  Rather than merely "disapprov[ing] of the Superior Court's decision" that "permits a police officer to detain an individual that merely has 'more information' about or a 'connection to" a criminal event,"[37] I would expressly overrule this aspect of *Bryant*.  As evidenced by the Superior Court's continued reliance upon that case, *Bryant* is no mere harmless misstatement of the law.  That court is invoking *Bryant*'s unsupportable—and unconstitutional—premise as a substantive legal basis to uphold seizures that, as I discuss below, are not otherwise supported by the necessary reasonable suspicion.  This error must be corrected.  Even though Jackson does not make a serious push to have *Bryant* overruled, his silence is no impediment to our ability to excise from the law books a case that serves no legitimate purpose and causes serious constitutional harm to boot.  We recently have acknowledged that a "precedent may be so questionable as to warrant overruling even when the parties have not raised the

---

[36]     Professor Wayne R. LaFave, who some call the "reigning expert on the law of search and seizure," WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, 4 SEARCH & SEIZURE § 9.2 n.a0 (6th ed.), explains that, although *Terry* stops originally were permissible for the purpose of preventing crime, the exception has been extended to allow stops for the purposes of crime investigation and detection.  *Id.* § 9.2(a) The Supreme Court of the United States has not yet extended *Terry* any further. Professor LaFave notes, however, that it might be "sensible" to permit *Terry* stops to freeze a possible scene and to ascertain a person's identity, or to determine if that person has "knowledge of material aid" in the investigation.  *Id.* § 9.2(b) (citing the Model Code of Pre-Arraignment Procedure § 110.2(1)(b)(1975)).  Neither the Supreme Court of the United States nor this Court ever has endorsed such an expansive use of *Terry* stops.

[37]     OISA at 28 (quoting *Commonwealth v. Jackson*, 271 A.3d 461, 464-65 (Pa. Super. 2021)).

point."[38] *Bryant* is one of those glaring mistakes that must be overruled before it can do any more damage to the constitutional rights of Pennsylvanians. While the OISA's "disapproval" of *Bryant* is a step in the right direction, a complete and final repudiation is necessary in order to ensure that the Superior Court's problematic ruling is never again used to justify an invalid *Terry* stop.

Nonetheless, up to this point in its analysis, the OISA adheres to the Supreme Court's recurrent admonitions that *Terry* be treated as a *narrow* exception to the Fourth Amendment's general rule. All of that changes when the OISA turns to the question of whether reasonable suspicion existed in this case to detain Jackson. The OISA views the facts of this case in a highly elastic manner, so as to venture the assertion that somehow Jackson "connect[ed] himself to the criminal activity at issue."[39] Although the OISA is correct that reasonable suspicion does not require "absolute certainty,"[40] and that, at times, and without any wrongdoing by law enforcement, detentions based upon

---

[38] *Commonwealth v. Alexander*, 243 A.3d 177, 196 (Pa. 2020) (citation omitted). *See also Commonwealth v. Ortiz*, 197 A.3d 256, 262 (Pa. 2018) (Wecht, J., dissenting):

> As I have explained in the past, both for the Court and individually, [that a party has not expressly asked that a precedent be overruled] should not be a categorical impediment to overruling indefensible, unsustainable, or conflicting case law. *See William Penn Sch. Dist. v. Pennsylvania Dep't of Educ.*, 170 A.3d 414, 447 n.49 (Pa. 2017) ("We would encourage the perpetuation of poorly reasoned precedent were we to permit ourselves to revisit the soundness of our case law only when expressly invited to do so based upon a given party's tactical decision of whether to attack adverse case law frontally . . . or to attempt more finely to distinguish the adverse decisions. The scope of our review is not so circumscribed."); *accord*, *Commonwealth v. Cagey*, 179 A.3d 458, 473 n.7 (Pa. 2018) (Wecht, J., concurring).

*Id.* at 262 n.1 (citations modified).

[39] OISA at 22.

[40] *Id.* at 21 (emphasis omitted).

reasonable suspicion may ensnare innocent people,[41] it does not follow that the Constitution allows every stop that emanates from even the slightest whiff of criminal activity.

While not quite as rigorous a standard as probable cause,[42] reasonable suspicion requires more than simply a police officer (or a court) with a "hunch."[43]  An investigative detention must be "justified at its inception" with "specific and articulable facts" (and with the reasonable inferences that can be drawn from those facts) that warrant the belief that the detainee is involved in criminal activity.[44]  Typically, the determination of reasonable suspicion happens on the street during rapidly evolving circumstances.  For this reason, courts cannot demand "scientific certainty," and instead must rely upon the detaining officer's "common sense judgments and inferences about human behavior."[45]  However, "in making such judgments and drawing such inferences, officers must weigh the totality of the circumstances," including "the presence of additional facts [that] might dispel reasonable suspicion."[46]

There is no dispute that the gunshots heard by Officer Swinarski in this case gave rise to a reasonable suspicion that a crime had been committed.  As the OISA notes, in

---

[41]     *Id.* at 19 (citing *Illinois v. Wardlow*, 528 U.S. 119, 125-26 (2000)).

[42]     *Kansas v. Glover*, ___ U.S. ___, 140 S. Ct. 1183, 1188 (2020) (explaining that reasonable suspicion always has been a "less demanding" standard that "can be established with information that is different in quantity or content than that required to establish probable cause") (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

[43]     *Id.* at 1187 (emphasizing that a "mere hunch does not create reasonable suspicion") (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014) (some quotation marks omitted)).

[44]     *Terry*, 392 U.S. at 20, 21.

[45]     *Wardlow*, 528 U.S. at 125.

[46]     *Glover*, 140 S. Ct. at 1191; *see also Interest of T.W.*, 261 A.3d 409, 429 (Pa. 2021) (Dougherty, J., concurring).

Philadelphia, the sound of gunfire within city limits presents compelling evidence of, at the very least, a violation of the City's no-discharge ordinance, even setting aside the possibility of a violent crime in progress.[47] However, the mere presence of criminal activity does not provide law enforcement officers *carte blanche* authority to detain anyone near the scene of that activity. There must also exist a reasonable suspicion that the person sought to be detained was involved in that criminal activity. As this Court explained in *Commonwealth v. Hicks*, "[t]he individualized nature of the justification for the seizure is central to the *Terry* doctrine, inherent in the requirement that an investigative detention must be premised upon specific and articulable facts particular to the detained individual."[48] And, as always, in reviewing whether the officer was justified in detaining a particular individual, we must evaluate the totality of the circumstances.[49]

With regard to the facts that we may review in performing this totality assessment, our standard of review is well-settled. Because Jackson prevailed before the suppression court, we are bound by the suppression court's factual findings, so long as they are supported by the record,[50] and we consider only those facts that support Jackson, as the

---

[47] *See* OISA at 22, n.15. Although I agree with the OISA that the sound of gunfire is sufficient evidence of criminal activity in this case, it is critical to highlight that this will not always be the case. For instance, rural areas or smaller towns might not share the strict regulations that may prevail in urban areas. Alternatively, the sounds of gunfire might emanate from a nearby shooting range or from hunting grounds. The point is that gunfire should not, *ipso facto*, be treated as evidence of criminality in all instances. Like all assessments of reasonable suspicion, the totality of the circumstances must be considered, and that includes the circumstances surrounding the gunfire, such as time, location, and local regulations. Not all sounds of gunfire are the same.

[48] 208 A.3d 916, 938 (Pa. 2019).

[49] *Id.* at 927 (citing *Cortez*, 449 U.S. at 417-18).

[50] *Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (citation omitted).

prevailing party, and those of the Commonwealth that are uncontradicted.[51]   It was 8 o'clock at night in Philadelphia.  Officer Swinarski was on patrol when he heard gunshots.  The officer turned his cruiser around and headed in the direction of the shots.  Notably, the location was not a "high crime area."[52]  Officer Swinarski saw Jackson running on a sidewalk.  Jackson was not looking back.  Jackson did not have a gun in either hand.  He was not bleeding, limping, or otherwise displaying any signs of injury.  His clothes were not tattered or torn so as to suggest he had been involved in any fight or struggle.  He did not reverse course or change direction upon seeing the police officer.  Instead, Jackson replied to Officer Swinarski when the officer asked why he was running.  Jackson appears to have told Officer Swinarski the truth.   Jackson said that he was "running from the gunshots."[53]  Suffering no obvious injuries, and presumably wanting to continue putting as much distance between himself and the gunshots, Jackson kept running, even though

---

[51]    *Commonwealth v. Mason*, 247 A.3d 1070, 1080 (Pa. 2021) (citing *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010)).   The OISA gets the standard of review backwards.  Rather than viewing the facts in favor of Jackson, the prevailing party below, the OISA instead employs a standard of review that emphasizes the Commonwealth's evidence.  *See* OISA at 14 n.12 (quoting *Commonwealth v. E.M.*, 735 A.2d 654, 657 (Pa. 1999)).  This is plainly erroneous.  *See Summers v. Certainteed Corp.*, 997 A.2d 1152, 1160 (Pa. 2010) (emphasizing that appellate courts must utilize the correct standard of review).

[52]    *See* Notes of Testimony ("N.T."), 2/11/2021, at 52 (suppression court ruling:  "I do not find that this was a high-crime area.  I don't believe evidence was on the record to support that determination.  All we have here is an individual on the street, engaging in running, and he -- and with good reason because there had been shots fired.").  As our jurisprudence currently stands, the location at which a police officer seizes a person matters.  If it matters that some areas are "high crime areas," then, just as importantly, it has to matter that the area involved in *this* case is *not* a "high crime area."  Thus, not only must we consider the trial court's rejection of Officer Swinarski's testimony regarding the character of the area as part of a totality of the circumstances assessment; we are bound by it.

[53]    *Id.* at 17.

Officer Swinarski then chose to demand that Jackson stop. At precisely that moment, Jackson was seized for purposes of Article I, Section 8 of the Pennsylvania Constitution.[54]

Considering all of these circumstances, I discern no error in the trial court's conclusion that reasonable suspicion was lacking to justify the seizure. None of these facts connect Jackson in any way to criminal activity. The only objectively reasonable conclusion that can be drawn from these facts is that Jackson was, as he stated, running away from the gunshots. Nothing about Jackson's behavior, or the police officer's observations of him, suggest that Jackson was the person that fired the shots minutes before, or that he was in any way involved in the shooting. The only reasonable inference that can be drawn from the officer's initial observation is that Jackson was near (not even at) the scene of a crime. It has long been the law of Pennsylvania that a person's presence at or near a crime scene, without more, is not evidence of that person's participation in that crime.[55] Proximity may "have aroused speculation or suspicion on the officers' part but [does] not meet the standard and quality of evidentiary proof required to satisfy the mandate of" our Constitution.[56]

Nor did Jackson's decision not to stop after briefly responding to Officer Swinarski give rise to reasonable suspicion. The initial interaction between the officer and Jackson was a "mere encounter." As such, Jackson was not required to stop.[57] Jackson was well within his constitutional rights to run right past the officer and continue his attempt to get

---

[54]    *See Commonwealth v. Jones*, 378 A.2d 835, 839 (Pa. 1977) (holding that a seizure occurs upon a command to stop from a police officer).

[55]    *See Commonwealth v. Goslee*, 234 A.2d 849, 851 (Pa. 1967).

[56]    Id. (quoting Commonwealth v. One 1958 Plymouth Sedan (Plaza), 211 A.2d 536, 540 (Pa. 1965)).

[57]    *See Commonwealth v. Ellis*, 662 A.2d 1043, 1047 (Pa. 1995) (citing *Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Bostick*, 501 U.S. 429 (1991)).

away from the gunshots. Doing what our Constitutions permit is not evidence of criminal behavior; a person may not constitutionally be punished for exercising his rights.[58] Jackson's failure to stop and converse further with the officer adds nothing to the reasonable suspicion calculus.

Our task here is to review the totality of the circumstances, not just those facts or circumstances that might now suggest a link, however tenuous, to the criminal activity at issue. That totality necessarily includes "the presence of additional facts [that] might dispel reasonable suspicion."[59] There are many such facts. Despite this constitutional command, the OISA disregards all of them. After hearing gunshots and seeing Jackson running, Officer Swinarski apparently had a hunch that Jackson was the shooter. Maybe the hunch was good. Maybe the hunch was bad. Either way, there was no evidence to elevate that hunch into a legally actionable level of suspicion. The officer did not see Jackson with a gun. Jackson was not covered in blood. Jackson made no incriminating statements, nor did he otherwise inculpate himself. He did not flee at the sight of the officer. These circumstances should have eliminated any hunch that Officer Swinarski may have harbored. The totality of the circumstances points to only one conclusion: Jackson was doing precisely what he said he was doing, running from gunshots. There is nothing criminal about that.

In reaching the opposite conclusion, the OISA casts aside the fact that running from gunshots is a normal, indeed instinctive, human reaction. The OISA excludes this consideration because Jackson relies upon Officer Swinarski's testimony that he (the

---

[58] *See generally Commonwealth v. Rivera*, ___ A.3d ___, 2023 WL 4095438, at *19 (Pa. 2023) (Wecht, J., concurring) (explaining that constitutional rights are stripped of their force and meaning if a person is punished for exercising them).

[59] *Glover*, 140 S. Ct. at 1191; *see also Interest of T.W.*, 261 A.3d 409, 429 (Pa. 2021) (Dougherty, J., concurring).

officer) also believed that running from gunshots is "normal."[60]  The OISA is correct that a law enforcement officer's subjective beliefs or intentions are irrelevant in a reasonable suspicion analysis.  We are required to examine the facts and circumstances available to the officer at the time of the interaction objectively, not as the officer interpreted them in his mind.[61]  That does not mean that we must ignore a fact that also is objectively and obviously true, just because it is (unsurprisingly) consistent with the officer's subjective beliefs.

While we are prohibited from including in our assessment specifically what Officer Swinarski believed constitutes "normal" behavior, we are not required to disregard the fact that, *objectively*, running from a dangerous situation (here, gunfire) is normal, rational, reasonable, and non-criminal behavior.  Our review is not as circumscribed as the OISA makes it out to be.  In fact, it is fair to say that it would be objectively abnormal for a person not to run from such a situation.  If nothing more, the fact that Jackson's behavior conformed to what would constitute objectively normal behavior under the circumstances underscores the absence of facts or circumstances linking Jackson to the criminal activity.  His behavior strongly suggests just the opposite.

Ultimately, the OISA rests its decision that reasonable suspicion existed in this case upon two circumstances, neither of which is convincing.  First, the OISA emphasizes that Jackson was a "*single individual*" running from the gunshots.[62]  This emphasis is perplexing.  The OISA fails to explain how or why Jackson's solitude is relevant to the reasonable suspicion calculus.  It is objectively reasonable behavior for a civilian to run

---

[60]     *See* OISA at 26 (quoting N.T., 2/11/2021, at 26, 30-31).

[61]     *See Terry*, 392 U.S. at 21 (mandating that "it is imperative that the facts be judged against an objective standard").

[62]     OISA at 22 (emphasis in original).

from the sound or sight of gunfire. For some unexplained reason, however, the OISA requires that a person who flees from a dangerous situation must first stop to find a partner or assemble a group, lest that person become a criminal suspect. The OISA offers no convincing rationale for this arbitrary and irrelevant distinction. I fail to discern how, without more, being alone or being with others makes any difference for purposes of reasonable suspicion, or how this case would have been any different if Jackson happened to be running alongside one or more others. Had Jackson been accompanied, would today's OISA rule that Officer Swinarski was bound to let them leave unimpeded because they were together instead of alone? Merely to put the question is to reveal the absurdity of the OISA's premise.

It is unsurprising that the OISA cannot cite a case from this Court to support its emphasis upon Jackson being unaccompanied in service of its reasonable suspicion determination. I know of no such case, nor has my research turned one up. The OISA's efforts must also have proved unavailing, because, for support of its holding, the OISA invokes two non-binding cases,[63] one from Ohio, *State v. Hairston*,[64] and one from our own Superior Court, *Bryant*, a case that the OISA disapproves. In any event, these cases do not stand for the proposition that a person's solitude alone contributes to reasonable suspicion. In fact, only one of the cases involved a person who was alone at the time of his apprehension.

In *Hairston*, while on patrol, two police officers heard gunshots and immediately drove in the direction of the sounds. Within a minute of hearing the shots, the officers

---

[63]     *See Koken v. Reliance Ins. Co.,* 893 A.2d 70, 83 (Pa. 2006) (noting that decisions of our sister states are not binding on this Court); *Marion v. Bryn Mawr Trust Co.*, 288 A.3d 76, 93 (Pa. 2023) ("Finally, and in any case, it is axiomatic that Superior Court decisions and lower federal court cases do not bind this Court.").

[64]     126 N.E.3d 1132 (Ohio 2019).

observed Hairston walking alone, talking on a cell phone.  The officers immediately detained and frisked Hairston, finding a gun.[65]  The Ohio Supreme Court ultimately ruled that reasonable suspicion existed under those circumstances.[66]  In *Bryant*, however, when police officers heard six gunshots and proceeded to the area from which the sounds emanated, they saw *two* males running in a high-crime area on a crowded street upon which no one else was running.[67]  It is troubling that the OISA finds it pertinent to the existence of reasonable suspicion in this case that Jackson was alone, notwithstanding the fact that the cases which the OISA cites provide no support for that proposition.  Indeed, *Hairston* involved only one person, while *Bryant* involved two.

Second, the OISA stresses the fact that Jackson did not seek Officer Swinarski's aid or protection as he ran away from the gunshots.  This factor fares no better in the analysis than the first.  The OISA does not explain convincingly how this leads to the conclusion that Jackson was involved in the criminal activity, does not provide any on-point, binding cases that stand for this dubious contention, and does not demonstrate that the cases upon which it does rely—*Hairston* and *Bryant*—warrant finding relevance in this fact.  An objectively reasonable person fleeing from a dangerous, active shooter might well decide in the moment that putting as much distance as possible between himself or herself and the shooter is the safest option.  Others might decide instead that stopping to seek assistance from a police officer might be the safest option.  There is no reason to believe, and the OISA offers none, that a person's choice of one course of action over the other implicates that person in criminal activity.  There is nothing inherently criminal or suspicious about Jackson's decision not to stop and ask Officer Swinarski for help.

---

[65]    *Id.* at 1135.

[66]    *Id.* at 1136.

[67]    *Bryant*, 866 A.2d at 1144-45.

Not only do *Hairston* and *Bryant* fail to support the two primary bases for the OISA's conclusion; both cases are also readily distinguishable and non-binding.[68] Start with *Hairston*. It is a crucial, if not determinative, distinction that the detention in that case occurred in a high-crime area,[69] whereas the area in which Jackson was apprehended was not. *Hairston* was found walking from the scene talking on a cellular phone less than a minute after the shooting. Jackson, on the other hand, was running from the area and told Officer Swinarski that he was fleeing from gunshots.

Aside from the sound of gunshots, there is little in common between *Hairston* and this case, and certainly not enough to incorporate that non-binding Ohio decision into our own case law. In addition to *Hairston*'s factual dissimilarities, I would assign no legal value to its rationale. Neither the OISA nor the Ohio Supreme Court explains how the objectively innocuous behavior of walking down a street while talking on a phone is in any way indicative of being involved in criminal conduct. The result of *Hairston*, and of today's decision, is to create a bubble of presumptive criminality that allows police to detain anyone within the proximity of a shooting, regardless of the objective reasonableness of the citizen's behavior or how little that behavior demonstrates involvement in criminal activity. We should reject *Hairston* outright, not welcome it with open arms.

*Bryant* is even more dissimilar—and just as non-binding—as *Hairston*. In *Bryant*, *two* men were seen rounding a corner in a high-crime area shortly after gunshots rang out. They were the only two people running on a crowded street immediately after the shots were heard. Their disparate behavior relative to the others on the street reasonably raised the police officers' suspicions. Nothing like that occurred here. Jackson was not the sole runner amidst a crowd of non-runners. He was the only person on the street,

---

[68] *See supra* n.61.

[69] *Hairston*, 126 N.E. 3d at 1136.

and he did nothing objectively to indicate that he was involved in the shooting. Even if we were bound by the Superior Court's decision in *Bryant* (which, of course, we are not), it would compel no particular conclusion, as the facts of that case differ significantly from those in the record before this Court.

The impact of today's decision cannot be overstated. The sad reality is that mass shootings are now endemic, and perhaps epidemic, in our society. There are shootings at shopping malls, supermarkets, schools, movie theaters, and day care facilities. All persons fleeing from those attacks now are in danger of having their privacies invaded unless they happen to satisfy the heretofore unstated, arbitrary criteria that might satisfy today's OISA. *Terry* was never intended to apply in this manner. *Terry* stops were meant to be focused, limited, individualized detentions that are brief in duration and narrow in scope. *Terry* did not validate what today's OISA would approve. Rather than demanding the specific and articulable individual grounds necessary to justify the "serious intrusion upon the sanctity of the person [that] may inflict great indignity and arouse strong resentment," the OISA accepts artificial and legally untethered conjectures and hunches.

Unsurprisingly, given its inability to connect what happened in this case to any reasonable criminal suspicion, the OISA provides little substantive retort to my criticism of its conclusions. Instead, the OISA chooses to tilt at the hypothetical with which I began this opinion. Here again, the OISA misses the mark. The purpose of such a rhetorical device is not to spin a good yarn. The purpose is to show just how far the OISA analysis would reach. Thus, while the OISA labors to distinguish my opening scenario, the fact remains that, distilled to its essence, the case before this Court involves an identical set of core facts: the sound of gunshots, a police officer lacking any knowledge of who fired the shots, and a person running alone from the vicinity whence those shots emanated, without asking for help. Those facts are indistinguishable from the present case. The

OISA cannot (and does not) explain why Jackson is a criminal suspect, while the "you" in my opening hypothetical is not.

The OISA shrugs off the obvious parallels between my hypothetical diner and Jackson by leaning once again upon the "axiomatic" feature of the law that "entirely innocent people may be caught up in a *Terry* stop."[70]  It is one thing when an innocent person is seized by police officers who possess a constitutionally adequate level of reasonable suspicion.  It is a different thing entirely to facilitate seizures of innocent people by refusing to hold police to the *Terry* standard.  And that is where the OISA would now take us.

The sound of gunshots induces immediate and instinctive fear and anxiety.  Unlike soldiers and police officers, civilians do, and should, run from those sounds.  After today, such instinctive flight turns citizens into criminal suspects.   The OISA's protestations notwithstanding,[71] that result is far more broad than what *Terry*, the Fourth Amendment, and Article I, Section 8 of the Pennsylvania Constitution permit.

Justice Donohue joins this opinion in support of reversal.

---

[70]     OISA at 30.

[71]     *Id.* at 31 n.18.